GRAYBURG OIL CO. v. STATE.   (No. 6984.)*

(Court of Civil Appeals of Texas. Austin.
June 12, 1926. Rehearing Denied
July 2, 1926.)

1. Taxation ⬳6, 18.

Neither state nor federal government can levy tax on the property or instrumentalities as such of the other.

2. Taxation ⬳6, 18.

For tax by state or federal government to invade province of the other, it must directly and immediately constitute burden on other's governmental functions.

3. Licenses ⬳7(1)—Occupation tax imposed by state statute on dealer in gasoline held, as to sales to federal government, not a tax on it (Acts 38th Leg. [1923] 3d Called Sess. c. 5 [Vernon's Ann. Civ. St. 1925, art. 7065]).

Occupation tax of a cent a gallon on gasoline sold, imposed by Acts 38th Leg. (1923) 3d Called Sess. c. 5 (Vernon's Ann. Civ. St. 1925, art. 7065), on dealer in gasoline, is not, as to sales made to the federal government, a tax on it or any agency or instrumentality thereof.

4. Commerce ⬳64—Tax on gasoline sold and delivered on military reservation is not burden on interstate commerce, reservation not being "territory" foreign to state (Acts 38th Leg. [1923] 3d Called Sess. c. 5 [Vernon's Ann. Civ. St. 1925, art. 7065]; Const. U. S. art. 1, § 8, subd. 17; Interstate Commerce Act, § 1).

Transactions whereby oil company sold gasoline to the United States to be delivered on its military station, in the state, and shipped it from its refinery in the state, did not constitute sales in interstate commerce, so as to make the gasoline occupation tax, imposed by Acts 38th Leg. (1923) 3d Called Sess. c. 5 (Vernon's Ann. Civ. St. 1925, art. 7065), as applied to such sales, a burden on interstate commerce; the ceding by the state to the United States of jurisdiction over such tract pursuant to Const.

⬳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error granted November 3, 1926.

U. S. art. 1, § 8, subd. 17, not constituting it "territory" foreign to the state, in the sense necessary for interstate commerce, as indicated by Interstate Commerce Act, § 1.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Territory.]

Appeal from District Court, Travis County; Geo. Calhoun, Judge.

Action by the State of Texas against the Grayburg Oil Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Victor Keller, of San Antonio, for appellant.

Dan Moody, Atty. Gen., and Ernest May, Asst. Atty. Gen., for the State.

McCLENDON, C. J. This suit was by the state of Texas against the Grayburg Oil Company to recover the sum of $12,014, besides interest and penalty, claimed by the state as the unpaid balance of occupation tax of one cent per gallon on gasoline sold at wholesale by the oil company in the state of Texas, between June, 1923, and December, 1924, under chapter 5, Acts of the Third Called Session of the 38th Legislature (Vernon's Ann. Civ. St. 1925, art. 7065). The sum in controversy is one cent per gallon on gasoline sold during the designated period by the oil company to the United States government, the sales of which were not included in the returns made by the oil company under the provisions of the act. The oil company defended on two grounds, in substance as follows: (1) That in making the sales the oil company was in effect an agency or instrumentality of the federal government, and to include the amount of these sales in the returns upon which the tax was computed would, in effect, be a tax upon the federal government itself, or upon one of its agencies or instrumentalities; and (2) that the sales did not come within the language of the act nor within the power of the state to be employed in computing the amount of the tax, for the reason that they did not constitute commerce or business wholly performed within the state of Texas, but were interstate business or commerce, or business or commerce transacted without the state of Texas; the evidence in this regard showing that the gasoline was sold to the government f. o. b. cars at Fort Sam Houston, a military station purchased by the federal government with the consent of the state and ceded by the state to it under the Constitution of the United States and laws of the state of Texas in such cases provided.

There was a trial to the court, and judgment was rendered in favor of the state against the oil company for the amount in suit with accrued interest. No penalties, however, were assessed. The oil company has appealed from this judgment, and the only questions presented are the two above stated, which are urged in this court as they were in the court below.

The facts are simple and without dispute.

The oil company is a corporation and was engaged in the business of refining and selling gasoline at wholesale in intrastate commerce and had its refinery in Bexar county, Tex. The sales in question were made during the period stated by the oil company direct to the United States government under advertisements for bids published by its proper military authorities.

The gasoline was refined at the oil company's refinery in Bexar county, was shipped in government cars to Fort Sam Houston, was inspected first by government inspectors at the refinery, but sold f. o. b. cars at Fort Sam Houston, and subject to the government inspection there, where it was again inspected and accepted.

Fort Sam Houston is a military station within the territorial limits of Bexar county. The land it embraces was purchased by the federal government, and jurisdiction over the territory was ceded by the Governor of Texas to the federal government under deeds executed in the year 1918, reciting that the government had acquired title by purchase to the land for the purpose of occupying it as a military station, and further provided:

"Whereas, the United States of America desires to acquire constitutional jurisdiction over said tracts or parcels of land for said purposes aforementioned and have made application to the Governor of the State of Texas in writing to that effect, together with proper evidence of such acquisition duly authenticated, together with an accurate description of said land as hereinbefore set forth; the evidence being also accompanied by map marked 'Exhibit B,' showing the property acquired for which constitutional jurisdiction is to be ceded: Now, therefore, I, W. P. Hobby, Governor of the said State of Texas, do hereby in the name and behalf of said state of Texas, cede to the United States of America exclusive jurisdiction over the said described tracts or parcels of land to hold, use, occupy, own, possess and exercise said jurisdiction over the same as long as the same remains the property of the United States of America; provided, however, that this cession of jurisdiction is granted and made upon the express condition that the state of Texas shall retain concurrent jurisdiction with the United States of America in and over said described tracts or parcels of land and every portion thereof so far that all process, civil or criminal, issuing under the authority of said state, or any of the courts or judicial officers thereof, may be executed by proper officials thereof upon any person or persons amenable to the same within the limits and extent of said tracts or parcels of land in like manner and effect as if this instrument had not been executed; saving, however, to the United States of America security to their property within said limits and extent, and exemption of the same and all of said tracts or parcels of land the improvements placed thereon from any taxation under the authority of said state of Texas

(286 S.W.)

while the same continues to be owned, held, used and occupied by the United States of America for the purposes expressed herein and not otherwise."

[1] Appellant's first contention is rested upon those fundamental principles which inhere in the dual sovereignty of the two governments, federal and state, functioning in the same territory but within separate jurisdictional spheres. Under these principles it is well established on reason and authority that neither government can interfere with the functions, agencies, or instrumentalities of the other, and neither can levy a tax upon the property, officers, agencies, or instrumentalities as such of the other.

The issue has been presented in numerous cases, and the principles above announced are so well established as to be regarded now as fundamental and elementary. Whenever, therefore, it can be said that a tax levied by a state is a tax upon the property, officers, agents, agencies, or instrumentalities as such of the federal government, it is void. And the rule is identical where the federal government levies a tax upon the property, etc. as such of a state.

[2] It is not, however, a necessary invasion of this principle that a tax levied by one government may eventually be borne by the other. It is obvious, from the very necessities of the situation presented by two sovereignties having the same territorial limits but with different jurisdictional spheres, that the proper functioning of either in raising revenues and otherwise carrying out its purposes will at times indirectly affect the other. Consequently the rule is equally well established that, in order for a tax by the one to invade the province of the other, it must directly and immediately constitute a burden upon the latter's governmental functions. It is also apparent that the application of these principles to the manifold situations that arise out of the exercise of their powers by the two sovereignties will of necessity in some instances present considerable difficulty.

[3] The particular question before us, we believe, however, is not of difficult solution in the light of adjudicated cases. The question was very ably discussed and the authorities reviewed by the Supreme Court of Washington in 1921, in the case of State v. Wiles, 116 Wash. 387, 199 P. 749, 18 A. L. R. 1163, and by the Supreme Court of the United States in the very recent case of Metcalf v. Mitchell, 46 S. Ct. 172, 70 L. Ed. 384. In the former case Wiles was convicted of "unlawfully using and operating a motor truck on the public highways of the county of King, state of Washington, without first obtaining a license therefor, as required by the state laws." Wiles had entered into a written contract with the government to carry the mail in the city of Seattle, between the various depots, wharves, docks, post offices, and substations therein. Under this contract he used motor trucks, including the one in question, without first obtaining a license. The trucks were used by Wiles only in this business; were painted with the usual insignia showing their use in the United States mail service; and the terms of his contract provided that they be properly equipped, kept in repair, and used only for carrying United States mail.

It was held, in an opinion evidencing much learning and research, that Wiles was not an agency or instrumentality of the federal government, but merely an independent contractor; that he was amenable to the tax on the vehicle in question; and the conviction was sustained.

The case of Metcalf v. Mitchell is, we think, practically on all fours with and decisive of the case at bar on this question. In that case Metcalf and another, who were partners engaged in the profession of consulting engineers, were employed by states, municipalities, or water or sewage districts created by states, and the services rendered were in connection with projects for water supply and sewage disposal, and compensation paid in some instances on an annual basis, in others on a monthly or daily basis, and still others on the basis of a gross sum for the whole service. The question involved in the case was whether the sums so earned could properly be taken into account in arriving at the amount of the gross income of the partners under the federal Income Tax Law. After determining that the partners under the employment were neither officers nor employees of the states, municipalities, or districts, but were independent contractors, the court proceeds:

"We pass to the more difficult question whether Congress had the constitutional power to impose the tax in question, and this must be answered by ascertaining whether its effect is such as to bring it within the purview of those decisions holding that the very nature of our constitutional system of dual sovereign governments is such as impliedly to prohibit the federal government from taxing the instrumentalities of a state government, and in a similar manner to limit the power of the states to tax the instrumentalities of the federal government."

After a very careful consideration of this question, the court concludes:

"But we do decide that one who is not an officer or employee of a state, does not establish exemption from federal income tax merely by showing that his income was received as compensation for service rendered under a contract with the state; and when we take the next step necessary to a complete disposition of the question, and inquire into the effect of the particular tax, on the functioning of the state government, we do not find that it impairs in any substantial manner the ability of plaintiffs in error to discharge their obligations to the state or the ability of a state or its subdivisions to procure the services of private individuals to aid them in their undertakings. * * * We

therefore conclude that the tax in No. 183 was properly assessed."

Appellant's counsel in oral argument contended that there is an essential difference between a tax based upon net income and a tax measured by quantity of the commodity sold; the contention in this regard being that in the case of income the burden upon the other government is remote and incidental, whereas in the case of a sales tax the price which the other government pays for the commodity is passed by the seller directly to such government and is in effect a tax on the government itself. This contention we think is without merit. The tax in either event is not upon the other government, nor upon any of its agencies or instrumentalities, but is upon an independent contractor dealing with the government. The tax in the present instance is an occupation tax for the privilege of engaging in the business of selling gasoline in Texas at wholesale, and the amount of the tax is fixed by the amount of gross sales by quantity within the state. The fact that some of these sales were made to the United States government, in our judgment, was no more a tax on that government than was the levying of an income tax measured by compensation received from states, municipalities, and districts, a tax on such states, municipalities, and districts. The principles involved in the two situations are we think identical, and the powers and limitations upon the federal government in the assessment of its taxes are not different from those inherent in or laid upon the state government.

It should be noted that in the Metcalf Case the court, by way of illustration, refers to the character of tax here in question in the following language:

"Here the tax is imposed on the income of one who is neither an officer nor an employee of the government and whose only relation to it is that of contract, under which there is an obligation to furnish services; for practical purposes not unlike a contract to sell and deliver a commodity."

[4] In arriving at a solution of the second question, we have experienced more difficulty, but after careful consideration of the decisions which seem to have bearing upon it, we have reached the conclusion that the transactions between the oil company and the government did not constitute sales in interstate commerce, but were sales wholly within the state of Texas. Under subdivision 17 of section 8, art. 1, of the United States Constitution, Congress is given power "to exercise exclusive legislation in all cases whatsoever, over such district (not exceeding 10 miles square) as may, by cession of particular states, and the acceptance of Congress, become the seat of the government of the United States, and to exercise like authority over all places purchased by the consent of the Legislature of the state in which the same

shall be, for the erection of forts, magazines, arsenals, dockyards, and other needful buildings."

It will be observed that the lands included in Fort Sam Houston were purchased by the government and the consent of the state thereto was evidenced by the grant of the Governor ceding to the government exclusive jurisdiction over the territory, "to hold, use, occupy, own, possess, and exercise such jurisdiction over the same as long as the same remains the property of the United States of America." There is a proviso that the cession of jurisdiction is granted under the express condition that the state retains concurrent jurisdiction to execute civil and criminal process; and there is an express exemption of the lands and improvements placed thereon from taxation "while the same continues to be owned, used and occupied by the United States of America for the purposes expressed herein, and not otherwise."

The provision of the United States Constitution quoted from gives to Congress the right to exercise jurisdiction over the territory acquired for the named purposes only, where the consent of the state is given. It has been held that a state may delegate to the Governor the power to give its consent. The Legislature of Texas has delegated to the Governor this power by statute. Articles 5242, 5247, and 5248, Revised Statutes of 1925. And the reservations and limitations contained in the grant above quoted from are those expressly provided for in articles 5247 and 5248. The right of the state to withhold or to grant its consent to cede jurisdiction necessarily carries with it the right to place limitations thereon, and such limitations have been held to be valid and effectual. There have been quite a number of adjudications with reference to the powers of the state in territory, jurisdiction over which has been ceded to the government in like cases. It has been uniformly held that legislative authority therein is absolute in the United States government and is wholly wanting in the state government. Consequently acts done within the territory are not punishable by state laws, and the police power of the state does not extend to any portion of the territory. The regulation of business, such as license taxes, where the business is conducted upon the ceded territory, are matters of federal and not state control. In the early case of Mitchell v. Tibbetts (Mass. 1835) 17 Pick. 298, it was held that a prosecution would not lie for the violation of a statute which made certain requirements of vessels transporting stone and gravel within the commonwealth, where the vessel was engaged in transporting stone from a point in Maine to the navy yard at Charlestown. The court construed the act to apply to landing stone, etc., at some place, or taking them from some place within the commonwealth, and held that a mere transporting through waters be-

longing to the commonwealth was not covered by the statute. The statute was held not to apply to the case in question, on the ground that the stone was not landed at a place within the state of Massachusetts.

It is quite evident that the statute there under consideration was a police regulation; and independently of whether the transportation might be regarded as inter or intra state commerce, when it is considered that under the interpretation given the statute its violation consisted solely in the landing of stone, and this landing was within the military reservation, the application of the statute in that case would have required a holding that the police power of the state extended to the ceded territory. It is clear that the decision reached was the only proper decision that could have been made. If the case had depended upon whether the transaction was inter or intra state commerce, then clearly the jurisdiction of the state would not have attached, because the shipment was from a point outside the state of Massachusetts. If the shipment had been from a point in Massachusetts, a different question would have been presented, and the case might properly have been decided wholly apart from the question of interstate commerce. In such case, even if the transaction be held to be interstate commerce, it would have been competent for the state to regulate the loading at a port within its borders, provided the effect of the statute was not unduly to burden interstate commerce.

There have been a number of cases upon the question of the power of a state to tax personal property situated upon military and Indian reservations within the state boundaries. With the exception of the case of Concessions Co. v. Morris, 109 Wash. 46, 186 P. 655, the uniform holding appears to be that such property, if not otherwise exempt, would be taxable. This case reviews the authorities upon the subject and distinguishes the other cases from the case there presented. The holding was that the property was not taxable where its situs was fixed by its physical location. The court say in concluding:

"It is to be borne in mind that we are not here concerned with the question of whether the personal property owned by the appellant might or might not be assessed and taxed against it at its place of residence within the state."

There are some expressions in the opinion which would lead to the conclusion that the court was of the view that the ceded territory ceased to be a part of the state and became a territory of the United States. These expressions, however, are not essential to the decision reached. If we concede the correctness of that holding, still it is not controlling in the case at bar. The right to tax personal property by virtue of its situs as fixed by its physical location might very well be held to be a proper legislative function, and where

legislative jurisdiction has been ceded to the federal government, it may be held to follow as a logical conclusion that the state's power of taxation within the district is wholly nullified, and this without a further holding that the district ceased to be within the territorial limits of the state for all purposes and absolutely. The case of Ft. Leavenworth Ry. v. Lowe, 114 U. S. 525, 5 S. Ct. 995, 29 L. Ed. 264, is probably a leading one upon this subject. The opinion is by Mr. Justice Fields, who enters into a lengthy dissertation upon the history and purpose of the constitutional provision in question, and the necessities which require complete legislative and administrative jurisdiction in the federal government. It is there pointed out, as in other cases, that the mere reservation by the state of concurrent jurisdiction to serve criminal and civil process does not in any way affect the absolute jurisdiction of the United States in matters of legislation, which includes, of course, the matter of taxation; but that this reservation is merely for the purpose of preventing the ceded jurisdiction from rendering the territory a harbor or place of refuge for those seeking to evade the processes of the state and its courts in the administration of criminal and civil laws. We attach no particular importance to the fact that this reservation is made in the grant.

The power of the United States government to own land is not an absolute one, but extends only to the necessary and incidental powers which it possesses as a sovereign government. It is essential in the administration of that government and the performing of its functions throughout the territorial limits of the United States that it have supreme legislative and administrative jurisdiction over such portions of the states as may be necessary in the performance of such functions. The power of the government in this regard is not only that of an individual proprietor or owner of land, but also that of a sovereign state to exercise governmental functions therein. In other words, sovereignty. But we apprehend that there is a marked difference between sovereignty acquired for such purpose and acquisition or ownership of territory where the permanent seat of government is to rest, or where the territory is to be administered generally by the United States government, as where foreign territory has been acquired by treaty or conquest, or where it holds the territory during a preterritory stage, pending its eventual admission into the Union as a sovereign state. In the latter instance it is clear that the territory constitutes no part of the state for any purpose, and commerce within its limitations is wholly foreign to the state, and commerce between it and the state is not commerce within the state.

We are supported in this view by the first section of the Interstate Commerce Act, which was originally passed in 1887 (24 Stat.

379). This act was very carefully drawn by able statesmen, and the language used in defining the cases to which the act should apply was precise, studied, and guarded. The act was undoubtedly intended to cover every case where commerce by common carriers by rail passed beyond the boundaries of the individual state, and was intended not to apply to commerce wholly within a state. The language of the statute is that its provision shall apply to any common carrier or carriers engaged in the transportation of passengers or property, etc., "for a continuous carriage or shipment, from one state or territory of the United States, or the District of Columbia, to any other state or territory of the United States, or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like manner of property shipped from any place in the United States, to a foreign country and carried from such place to a port of transshipment, or shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent foreign country."

We think the word "territory," as used in this act, is to be given its generally accepted meaning. If it had been intended by the framers of the act to apply it to all territory over which the United States has legislative jurisdiction, different language would have been used, and the specific designation of the District of Columbia would in that case have been wholly superfluous. We think the word was meant to designate those portions of the territorial possessions of the United States which were organized and exercised governmental functions under act of Congress, and were political units subject exclusively to the federal government, such as the territories which have from time to time been granted statehood.

We do not think the effect of ceding to the United States legislative and administrative jurisdiction over territory held by that government solely for military purposes in carrying out its general powers to provide for the national defense, removes the territory thus ceded from the boundaries of the state in which it is located within the meaning of those legal principles which deny to the states any power or control by taxation or otherwise over interstate commerce. The framers of the Interstate Commerce Act clearly must have had the same view, or there would have been express provision to cover such cases, since there are military reservations in various states scattered throughout the Union. The establishment of forts, arsenals, reserva-

tions, etc., for military purposes, may or may not be permanent. Clearly the United States government would not have the power to acquire land and have jurisdiction ceded to it for such purposes, and then pervert the grant to wholly and different purposes, without a further consent on the part of the ceding state. When the use for the purposes of the grant has ceased, and the grant for such purposes is abandoned, then clearly the jurisdiction of the state in so far as its sovereignty is concerned reattaches. The right to tax the land owned by the government would still not exist, but its exemption from state taxation would rest upon another principle; that is, upon its federal ownership as an individual proprietor. While conceding the full grant of sovereignty for legislative and administrative purposes to the United States government over the territory thus ceded, we are unable to bring ourselves to the conclusion that the territory becomes wholly foreign to the state in matters of commerce, and that the transactions involved constituted interstate and not intrastate commerce.

The oil company was not conducting business within the military reservation; it had no license from the United States government, maintained no office, and had no place of business therein, but merely made sales to the government as to any other individual, and made deliveries within the military reservation. It is unimportant, we think, at what point the title to the gasoline passed from the oil company to the government. We may concede for the purposes of this case that it passed upon inspection and acceptance at destination. If the tax should be held invalid as being a burden upon interstate commerce, it would be equally so although the title passed when the gasoline was put upon the cars at the company's refinery; there being a contract to deliver within the military reservation. The fact that a portion of the transaction may have happened within the state of Texas, and without the military reservation, would not therefore make it commerce wholly within the state. These principles, we think, are well established and render immaterial what construction be put upon the transaction with reference to the place where the title to the property passed. We think the ceding of jurisdiction over the territory did not constitute it territory foreign to the state of Texas, in the sense that commerce conducted between a point in the state and a point within the territory was foreign or interstate commerce; and therefore we hold that the tax was valid as to these sales.

The trial court's judgment is affirmed.

Affirmed.