## MILK CONTROL BOARD *vs.* GOSSELIN'S DAIRY, INCORPORATED.

Suffolk. December 14, 1937. — September 14, 1938.

Present: FIELD, C.J., LUMMUS, QUA, & COX, JJ.

*Milk. Constitutional Law,* Federal agency, Police power.

Application of minimum prices established by orders of the milk control board under St. 1934, c. 376, as amended, to the sale of milk by a dealer to the United States for delivery within the jurisdiction of the Commonwealth at a veterans' hospital was constitutional.

A sale of milk by a dealer to the United States for delivery within the jurisdiction of the Commonwealth at a veterans' hospital at a price lower than the minimum price fixed by order of the milk control board was a violation of § 15 (D) (G) of St. 1934, c. 376.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on October 25, 1937.

The case was reserved and reported by *Donahue,* J.

*M. M. Goldman,* Assistant Attorney General, for the plaintiff.

*J. F. Egan,* for the defendant.

QUA, J. This is a bill in equity by the milk control board established by St. 1934, c. 376, to enjoin the defendant, a licensed milk dealer, from selling milk to the United States for delivery at the veterans' hospital at Northampton at prices two and three cents a quart below the prices fixed by an order of the board. St. 1934, c. 376, § 15, and § 11, as amended by St. 1937, c. 428, § 2.

The facts are not in dispute. It is stated in the "stipulation of agreed facts" that the sole issue involved is whether the minimum prices established by order of the board apply to contracts made for the sale of milk to the

United States government where delivery is made within the Commonwealth. We construe the agreed facts, taken as a whole, as indicating that delivery of the milk takes place within the jurisdiction of this Commonwealth. No contention has been made to the contrary.

St. 1934, c. 376, as amended by St. 1937, c. 428, is a "milk control law" of the same general class as those held constitutional in *Nebbia* v. *New York*, 291 U. S. 502, and *Highland Farms Dairy, Inc.* v. *Agnew*, 300 U. S. 608. No question has been raised as to the validity of these statutes in general, and for the purposes of this case we may assume them to be valid. Question is raised only as to their effect upon sales of milk to the United States. By the provisions of the statutes the board is empowered to fix minimum prices to be paid by dealers to producers and others and under certain conditions to fix, by official order, minimum wholesale and retail prices for milk sold within specified "market production zones." St. 1934, c. 376, §§ 6 (1), 15 (C). Section 1 of the act of 1934, which is in the nature of a preamble, reads as follows:

"Section 1. It is hereby declared (1) that the production and distribution of milk is an industry of the commonwealth affected with a paramount public interest in that the health of the public, and especially of infants and children, imperatively requires an uninterrupted continuance of an abundant supply of pure milk; (2) that such a supply is threatened by conditions adversely affecting the prosperity and even the continuance of such industry, largely because of the disparity between the price of milk received by the producers and the prices said producers are required to pay for other essential commodities; (3) that such conditions also seriously impair agricultural assets and therefore the credit structure of the commonwealth and its political sub-divisions, — accordingly, to meet the grave public emergency involved in the foregoing premises, this act is enacted as an emergency measure, but for such period only as such emergency shall continue.

"The intention and purpose of this act is hereby declared to extend to the regulation of the milk marketing industry and to the control in general of all milk sold or offered or exposed for sale to the inhabitants of the commonwealth to the full extent permitted by the constitutions of the commonwealth and of the United States, respectively, as applied to legislation enacted under the emergency conditions described in this act."

It is conceded of course, fully and ungrudgingly, that a State cannot attempt to regulate an instrumentality of the United States or impose burdens upon it which interfere with its operation and efficiency. On the other hand we apprehend that an institution of the Federal government situated within a State cannot wholly escape every consequence arising from a fact so pervasive and insistent as is the fact of location in the midst of a civilized community whose orderly existence and continuance are derived from and supported by another sovereignty of general powers. In this case certain facts stand out. The legislation of this Commonwealth is not directed against the veterans' hospital at Northampton. If the objects stated in the preamble are realized, that hospital will benefit in common with the community in general. Conversely, if dealers are to be free to ignore the law in dealing with the hospital, the whole plan will suffer proportionately. There is no discrimination against the hospital. It can buy milk as others buy milk and at any price which competition may fix not lower than the established minimum. No burden upon it can result, even indirectly, which does not likewise fall upon all users of milk, including institutions of this Commonwealth of comparable nature. No attempt is made in the law, or in the order of the board, or in this litigation to control or to give any order or direction to the veterans' hospital or to any of its officers. The incidence of the law is upon dealers in milk. Although enforcement of the law against such dealers may in fact affect the price of milk to the hospital as well as to others, yet that result is in its nature incidental and collateral rather than immediate and

direct. · No doubt a careful search would reveal many statutes enacted for the protection of the people of this Commonwealth against fraud, disease, accident or other evils, the enforcement of which no less certainly has the effect of raising prices paid by Federal agencies. Pure food laws, minimum wage and labor laws and social insurance laws readily come to mind as examples. Illustrations superficially closer to this case may be found in the statutes regulating the quality and providing for the inspection of milk. Those statutes are designed to preserve the purity, as the milk control law is designed to secure the quantity and regularity of supply, of a necessary article of food. All of these laws increase prices, frequently by ascertainable amounts. Upon analysis it is difficult to discover any real difference in principle between these laws and the milk control law as affects the present problem. What difference there is seems to lie not in the authority and binding force of the statutes or even in the degree to which they affect Federal instrumentalities adversely, but merely in that the increase in prices is more easily seen and measured in this instance than in some of the others.

Instrumentalities of the Federal government are constantly increasing in number and importance throughout the several States. Their contacts with the surrounding inhabitants of the States are constant and innumerable. If residents of the States are to be released from their obligations to obey State laws whenever in the course of these contacts it is for the moment advantageous to the Federal agency that they should be released, the time may arrive when in the aggregate the encroachment upon the public order of the States will become substantial. And in this connection it should also be remembered that the Federal agencies may seldom have complete power and will almost never be under the obligation to establish new regulations for the protection of the public in place of those which, in so far as concerns them, they set aside.

We have seen no decision which seems to us to go quite so far as to require the release of the defendant in this case from its obligation to obey the law. Most of the cases

relate to attempts by the States to enforce their taxes against Federal agencies or Federal transactions, and as to this a strict rule has prevailed since *M'Culloch* v. *Maryland*, 4 Wheat. 316. But even in this field a distinction has been recognized between taxes which directly affect the operations of the government and those whose effect is incidental and collateral only. *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, 523. *Susquehanna Power Co.* v. *State Tax Commission of Maryland* (*No. 1*), 283 U. S. 291. *Trinityfarm Construction Co.* v. *Grosjean*, 291 U. S. 466. *Commissioner of Internal Revenue* v. *Mountain Producers Corp.* 303 U. S. 376. Compare *Panhandle Oil Co.* v. *Mississippi*, 277 U. S. 218.

In any event these tax cases do not seem to us controlling here. In those instances the State was attempting to derive a part of its support at the expense of the Federal government. Here the State is merely trying to enforce upon one of its own corporations a law enacted in pursuance of the police power for the common welfare. It has been held that Federal instrumentalities are subject to the reasonable exercise of the police power of the States in certain matters affecting their external relations, at least where no Federal law or rule provides otherwise. *Commonwealth* v. *Closson*, 229 Mass. 329. (Driver of a mail wagon must obey traffic regulations. On same subject, *Johnson* v. *Maryland*, 254 U. S. 51, *Ex parte Willman*, 277 Fed. 819, *State* v. *Wiles*, 116 Wash. 387.) *St. Louis* v. *Western Union Telegraph Co.* 148 U. S. 92; 149 U. S. 465 (charges for use of streets for poles). *Martin* v. *Pittsburg & Lake Erie Railroad*, 203 U. S. 284, 292 (limitation of liability for negligence of railroad applies to railway postal clerk). *Allen* v. *Riley*, 203 U. S. 347 (regulation of transfer of patents to prevent fraud).

Other classes of cases to be distinguished are those where the State has attempted to inject its laws into the internal management of a Federal institution or has attempted to punish those in charge of it for carrying out the valid directions of Federal authority. *Ohio* v. *Thomas*, 173 U. S. 276. *Easton* v. *Iowa*, 188 U. S. 220. There is nothing of that kind here.

In the present development of the law the question admits of doubt, but until higher judicial authority decides otherwise we incline to the view that a dealer furnishing milk in this Commonwealth to the veterans' hospital remains bound by the Massachusetts milk control law. The only reported decision which we have seen directly in point takes a similar view. *Paterson Milk & Cream Co. Inc.* v. *Milk Control Board,* 118 N. J. L. 383.

The defendant contends that our milk control law applies only to sales of milk to inhabitants of this Commonwealth and therefore that sales to the United States are by its terms wholly exempt from its operation. In support of this it seizes upon the phrase "to the inhabitants of the commonwealth" which appears in the second paragraph of the preamble hereinbefore quoted. But this places far too much emphasis upon the literal meaning of the words in the preamble as compared with the scope and tenor of the act as a whole. Even the paragraph in which the words occur seems intended in general to carry a comprehensive rather than a restrictive significance. At all events there is nothing in the operative language of the act itself limiting its application to sales to inhabitants. On the contrary the broadest terms are used both in the definitions and throughout the regulatory provisions. The purpose is obvious to control in its entirety the business of selling milk within the Commonwealth. The act of 1934 itself states in § 15 (G) that its provisions apply to "all" milk handled within the Commonwealth by a dealer licensed or required to be licensed and that "any sale within the commonwealth by any such milk dealer of any such milk" acquired at a price less than the minimum price fixed by the board "shall be a violation of this act." Any distinction between sales in this Commonwealth to residents and sales to non-residents such as visitors or foreign corporations doing business here would be wholly artificial and unrelated to the objects of the act, and would open the door to evasions which would tend to defeat its purposes. Such general statements of the scope or purpose of an act as appear in a preamble or a title may aid construction of

doubtful clauses, but cannot control the plain provisions of the enactment. *Lorain Steel Co.* v. *Norfolk & Bristol Street Railway,* 187 Mass. 500, 505.

A final decree is to be entered permanently enjoining the defendant from selling milk in this Commonwealth to the United States for delivery at the veterans' hospital at Northampton at prices lower than the minimum prices fixed for such sales by orders of the milk control board.

*Ordered accordingly.*