[S. F. No. 16694.   In Bank.   Mar. 12, 1942.]

PACIFIC COAST DAIRY, INC. (a Corporation), Petitioner, v. DEPARTMENT OF AGRICULTURE OF THE STATE OF CALIFORNIA et al., Respondents.

Vincent W. Hallinan and Carey Van Fleet for Petitioner.

Frank J. Hennessy, United States Attorney, and William E. Licking, Assistant United States Attorney, as Amici Curiae, on behalf of Petitioner.

Earl Warren, Attorney General, Wm. T. Sweigert, Assistant Attorney General, and W. R. Augustine, Deputy Attorney General, for Respondent.

TRAYNOR, J.—In 1935 the California legislature passed an act regulating the marketing and distribution of fluid milk and fluid cream. (Cal. Agr. Code, Div. 4, ch. 10, secs. 735-738.) The act declares that it is the policy of the state to promote the intelligent production and orderly marketing of such essential commodities as milk; that an adequate supply of wholesome milk is vital to the public health; that the production, transportation, processing, storage, distribution, and sale of milk and cream therefore constitute an industry affected with a public interest; and that unfair and destructive trade practices in the production, marketing, and distribution of milk and cream have menaced the public health by undermining sanitary regulations, which cannot of themselves guard against serious deterioration in the supply of milk. (Agr. Code, sec. 735.) It sets forth as one of its objectives the elimination of "speculation, waste, improper marketing, unfair and destructive trade practices, and improper accounting for milk purchased from producers. . . ."

The act as amended (Stats. 1937, ch. 3, 413, 710; Stats. 1941, ch. 1214) empowers the Director of Agriculture to set up defined marketing areas within the state, to prescribe minimum prices for fluid milk and fluid cream to be paid by distributors to producers in accordance with stabilization and marketing plans for such areas (secs. 735.4 (b) (4) (5) and 736.3 (b) (c)), to prescribe minimum wholesale and

retail prices of fluid milk and fluid cream within each area (Agr. Code, secs. 736.11, 736.12), to license milk distributors within each area, to revoke or suspend licenses for violation of any stabilization and marketing plan, and to bring actions to enjoin such violations. (Agr. Code, sec. 737.7.)

The petitioner seeks a writ of mandamus ordering the Director of Agriculture to dismiss proceedings undertaken pursuant to section 737.11 of the Agricultural Code with the object of revoking petitioner's license. In these proceedings it is alleged that petitioner violated section 736.3 (a) (6) of the code and of the Stabilization and Marketing Plan for the Santa Clara Marketing Area by purchasing, processing, bottling, transporting, and delivering in the Santa Clara Marketing Area fluid milk that it sold to the Federal Government for less than the minimum wholesale prices prescribed for that area. The sale occurred on Moffett Field, territory within the geographic boundaries of the Santa Clara Marketing Area, but subject to the exclusive jurisdiction of the federal government.

Since the demand for fluid milk fluctuates from day to day and cannot be anticipated exactly, the producers must supply enough milk to meet all reasonable needs; then any surplus, or "stand by," is converted into milk products and sold by the distributors at lower prices, with corresponding lower receipts for the producers. The possibility of a surplus has been a constant threat to the stability of prices paid to the producers, given the reluctance of distributors to pay the full price for milk that becomes in part converted into milk products. A stabilization plan counteracts this downward pull by establishing minimum prices for fluid milk. At the end of a given period, the distributor settles his accounts with the producer by paying him a "blended price" representing the price for fluid milk bought less the difference between that price and the price for the milk converted into milk products. Even then the producer does not know what the blended price will be until the expiration of the period for settling accounts. The minimum price of fluid milk, however, represents a fixed element in the blended price that affords him at least some protection against speculation at his expense in the distribution of milk. If the distributor were under no compulsion to pay a minimum price he would seek to shift to the producer the risk of speculation in a fluctuating market by paying him the lowest possible price, not

only for fluid milk sold to consumers but for milk converted into milk products, and there would soon be adverse effects on standards of production.

The same adverse effects would result if the minimum price established by a stabilization plan were not uniformly enforced. The act itself anticipates that possibility by specifying that there may be no departures from the minimum price even when the milk is sold to the Federal Government on territory within the exclusive jurisdiction of that government. Section 736.3 (a) provides that any stabilization and marketing plan shall prohibit distributors and retail stores from engaging in such unfair practices as:

"(7) The payment of a lesser price by a distributor to any producer for fluid milk or fluid cream which is distributed to any person, including agencies of the Federal, State or local government, located upon property within the geographical limits of any marketing area for less than the minimum prices established by the director to be paid by distributors to producers for fluid milk or fluid cream for said marketing area.

"(8) The purchasing or receiving of any fluid milk or fluid cream by distributors from producers within a marketing area wherein a stabilization and marketing plan is in effect for less than the minimum prices established in such plan, regardless of whether such milk or cream is subsequently sold or distributed within or without such marketing area, or within or without the jurisdiction of the State of California."

The validity of such provisions is clear. (*Milk Control Board* v. *Eisenberg Farm Products*, 306 U. S. 346 [59 S. Ct. 528, 83 L. Ed. 752] ; *Alabama* v. *King and Boozer*, —— U. S. —— [62 S. Ct. 43, —— L. Ed. ——] ; *James* v. *Dravo Contracting Co.*, 302 U. S. 134 [58 S. Ct. 208, 82 L. Ed. 155, 114 A. L. R. 318].)

In its original form in 1935 the milk control act prescribed minimum prices to the producers only. To prescribe such prices without also prescribing minimum resale prices is ineffectual, however, since the distributors cannot pay the producers the prescribed prices unless they have some guarantee of corresponding returns. Minimum resale prices, moreover, must govern all transactions, particularly those of the producer who is his own distributor and who is otherwise apt to sell to consumers at prices below those at which regular

distributors are required to operate. In the light of these considerations, Article 2A was added in 1937 to provide for minimum wholesale and retail prices. Section 736.11 provides that in all marketing areas where a stabilization and marketing plan is in effect the Director of Agriculture shall prescribe minimum wholesale prices at which milk shall be sold by distributors to retail stores, and minimum retail prices at which fluid milk shall be sold by distributors and retail stores to consumers. Section 736.12 provides that in determining minimum prices for any marketing area the director shall make an investigation relative to that area of such factors as the quantities of fluid milk distributed and normally required by consumers, the price to distributors and their handling costs, and the available capacity for processing and distributing. Section 736.13 prohibits sale by distributors at less than the prescribed prices.

The most real danger to the prescribed minimum lies in sales by distributors at lower prices on areas within the exclusive jurisdiction of the federal government, where transactions cannot be regulated by the state. Prescribed minimum prices fail of their purpose if they lie in the shadow of cut prices. The route of the milk from the producer to the consumer is a continuous one even when it crosses the imaginary line that demarcates federal jurisdiction, and the evil effects of substandard prices in the federal area course backward to play their part in undermining the intelligent production and orderly marketing that the state has declared essential to the public health. The state has therefore undertaken to regulate the milk industry within the bounds of its jurisdiction in such a manner as to obviate the elusive evils that it could not directly attack. Section 736.3 (a) (6) of the Agricultural Code provides that any stabilization and marketing plan shall prohibit distributors and retail stores from engaging in such unfair practices as,

"(6) The purchasing, processing, bottling, transporting, delivering or otherwise handling in any marketing area of any fluid milk or fluid cream which is to be or is sold or otherwise disposed of by such distributor at any place in the geographical area within the outer, outside and external boundaries or limits of such marketing area, whether such place is a part of the marketing area or not, at less than the minimum wholesale and minimum retail prices effective in such marketing area."

The Stabilization and Marketing Plan for the Santa Clara Marketing Area contains the provisions outlined by this section. These regulations are directed at the milk before it can enter the stronghold of an area within the state's boundaries but outside its jurisdiction on terms that would menace the entire milk supply. The alleged violation in the present case is the purchasing, processing, bottling, transporting, delivering, and other handling of milk within the Santa Clara Marketing Area for prospective sale at a point outside the jurisdiction of the state at prices less than the minimum prescribed for that marketing area. Petitioner contends that the state's control over activities within its jurisdiction affords it no authority to impose penalties because of transactions on Moffett Field. This contention proceeds from the theory that such penalties violate the due process clause of the 14th Amendment to the Constitution of the United States, denying to a state the power to restrict or control activities, persons, and property beyond its jurisdiction. (*Standard Oil Co. of California* v. *California*, 291 U. S. 242 [54 S. Ct. 381, 78 L. Ed. 775] ; *Allgeyer* v. *Louisiana*, 165 U. S. 578 [17 S. Ct. 427, 41 L. Ed. 832] ; *St. Louis Cotton Compress Co.* v. *Arkansas*, 260 U. S. 346 [43 S. Ct. 125, 67 L. Ed. 297] ; *Compania General de Tabacos de Filipinas* v. *Collector of Internal Revenue*, 275 U. S. 87 [48 S. Ct. 100, 72 L. Ed. 177] ; *Home Ins. Co.* v. *Dick*, 281 U. S. 397 [50 S. Ct. 338, 74 L. Ed. 926].) This contention, however, confuses the state's control over activities, persons, and property within its jurisdiction and the repercussions of that control in areas outside thereof. The question is not whether the state can prescribe the minimum prices at which milk may be sold on the territory within the exclusive jurisdiction of the United States. (Cf. *Consolidated Milk Producers* v. *Parker*, this day decided), but whether it has power to regulate acts within its jurisdiction even though they are followed in direct line of succession by a transaction outside its jurisdiction.

It is established that a state may validly regulate activities, persons, and property within its jurisdiction, even though extra-territorial repercussions ensue, whenever such regulation is vital to the welfare of its inhabitants. The propriety of the regulation is determined by its focus upon an internal problem and not by the range of its influence. Thus, in

*Mirkovitch* v. *Milnor,* 34 Fed. Supp. 409, the court held that the state could exercise its police power over boats within state waters in a manner that was bound to affect their activities beyond state borders. Threatened with the depletion of its fish supply by the practices of certain fishermen, California provided in the Fish and Game Code that no person shall use a boat in this state or its waters that delivers to any point outside the state fish caught from the boat in the waters of the Pacific Ocean within the state or on the high seas or elsewhere without authorization of the Fish and Game Commission. The court pointed out that the code provision related solely to the operation within state waters of fishing vessels delivering their catch outside the state, and emphasized that the provision was designed not to regulate fishing operations beyond the state's jurisdiction but to protect the state's fisheries from depletion. The realization that the plaintiff might be unable to carry on fishing operations beyond the state's jurisdiction without entering and operating his boat within state waters did not deter the court from declaring that the statute was a valid exercise of the state's police power over acts within its jurisdiction.

In *Osborn* v. *Ozlin,* 310 U. S. 53 [60 S. Ct. 758, 84 L. Ed. 1074], the United States Supreme Court upheld a Virginia statute requiring that insurance policies for persons or property in Virginia written by companies authorized to do business in Virginia be countersigned by a local agent receiving a certain percentage of the commission, even though insurer and insured are both outside of Virginia when the contract of insurance is negotiated. The close relation between the insurance contracts and the insured persons or property, together with the state's interest in protecting such persons and property, justified the regulation despite its extra-territorial effect. The court stated: ''But the question is not whether what Virginia has done will restrict appellant's freedom of action outside Virginia by subjecting the exercise of such freedom to financial burdens. The mere fact that state action may have repercussions beyond state lines is of no judicial significance so long as the action is not within that domain which the Constitution forbids. . . . Virginia has not sought to prohibit the making of contracts beyond her borders. She merely claims that her interest in the risks which these contracts are designed to prevent warrants the kind of control she has here imposed. This legislation is not

to be judged by abstracting an isolated contract written in New York from the organic whole of the insurance business, the effect of that business on Virginia, and Virginia's regulation of it.'' (Pages 62, 63.) (See, also, *Holmes* v *Springfield Fire & Marine Insur. Co.*, 311 U. S. 606 [61 S. Ct. 19, 85 L. Ed. 384] ; 32 Fed. Supp. 964; *National Union Fire Ins. Co.* v. *Wanberg*, 260 U. S. 71 [43 S. Ct. 32, 67 L. Ed. 136], and *Palmetto Fire Ins. Co.* v. *Conn.*, 272 U. S. 295 [47 S. Ct. 88, 71 L. Ed. 243] ; Brandeis's dissent in *New York Life Ins. Co.* v. *Dodge*, 246 U. S. 357, 377 [38 S. Ct. 337, 62 L. Ed. 772] ; cf. *Fidelity & Deposit Co.* v. *Tafoya*, 270 U. S. 426 [46 S. Ct. 331, 70 L. Ed. 664].)

Again in the application of state workmen's compensation laws, it is established that where the injury occurs in one state and the contract of employment is entered into in another, the statute of the state with the greater interest in the welfare of the injured workman controls. (*Alaska Packers Assn.* v. *Industrial Acc. Com. of California*, 294 U. S. 532 [55 S. Ct. 518, 79 L. Ed. 1044] ; *Pacific Employers Ins. Co.* v. *Industrial Acc. Com. of California*, 10 Cal. (2d) 567 [75 Pac. (2d) 1058].) In the Alaska Packers case the California Workmen's Compensation Act was held applicable to an injury sustained in Alaska by a workman who resided in California and entered into the contract of employment here. The court noted California's interest in the welfare of the injured workman, stating: ''Obviously the power of a state to effect legal consequences is not limited to occurrences within the state if it has control over the status which gives rise to those consequences.'' (Page 541.) (See, also, *J. C. Penney Co.* v. *Wisconsin Tax Com.*, 311 U. S. 435 [61 S. Ct. 246, 85 L. Ed. 267, 130 A. L. R. 1229] ; *Great Atlantic & Pacific Tea Co.* v. *Grosjean*, 301 U. S. 412 [57 S. Ct. 772, 81 L. Ed. 1193, 112 A. L. R. 293] ; *Nelson* v. *Sears, Roebuck & Co.*, 312 U. S. 359 [61 S. Ct. 586, 85 L. Ed. 888, 132 A. L. R. 475].)

The foregoing cases establish that a state may exercise its power over things within its jurisdiction in the knowledge that it will thereby influence things beyond its jurisdiction, and that its influence may be far reaching, so long as the external consequences remain incidental to the solution of internal problems. Their application to the present case is clear. In accomplishing the objectives of the state milk control act the state is concerned, not with the destination and

sale of the milk but with the effect of the price of the milk upon the conditions of production. A price below the fixed minimum for milk produced in the state endangers those established standards for the milk industry that safeguard the public health, and leads successively to a breakdown of the law, price cutting, diminishing returns to the producers, inferior standards of milk production and finally injurious effects on the public health. The state has regulated the purchasing, processing, bottling, transporting and handling of fluid milk within its jurisdiction with the object, not of controlling transactions beyond its jurisdiction, but of stabilizing within its jurisdiction the producton of a commodity vital to the public health.

■ The state milk control act, however clear its validity under the due process clause, must be scrutinized further in the light of the commerce clause and the Federal Agricultural Marketing Agreement Act of 1937 (50 U. S. Stats. 246), held constitutional in *United States* v. *Rock Royal Co-op.*, 307 U. S. 533 [59 S. Ct. 993, 83 L. Ed. 1446]. The federal act authorizes the Secretary of Agriculture to enter into marketing agreements fixing minimum prices to be paid producers for milk that is "in the current of interstate or foreign commerce" or that "directly burdens, obstructs or affects interstate or foreign commerce." (Sec. 8 (c) (1), (2), (5), (7), (8), and (18), 7 U. S. C. A. sec. 608c.) It defines interstate or foreign commerce as "commerce between any State, Territory or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, but through any place outside thereof; or within any Territory, or possession, or the District of Columbia. For the purpose of this chapter . . . a marketing transaction in respect to an agricultural commodity or product thereof shall be considered in interstate or foreign commerce if such commodity or product is part of that current of interstate or foreign commerce usual in the handling of the commodity or product whereby they or either of them, are sent from one State to end their transit, after purchase, in another, including all cases where purchase or sale is either for shipment to another State or for the processing within the State and the shipment outside the State of the products so processed. . . . As used herein, the word 'State' includes Territory, the District of Columbia, possessions of the United States, and

foreign nations.'' Sec. 10(j), 7 U. S. C. A. sec. 610(j).) The extensiveness of this definition leaves no doubt that Congress intended to cover the broadest possible field that might come within its powers to regulate interstate commerce and to govern territories.

The shipments of milk from California to such areas as Moffett Field, where the transit ends, fall within this definition of interstate commerce, for Moffett Field can be classified as either a territory or possession of the United States outside the jurisdiction of California, even though within the state's boundaries.

The contention is nevertheless advanced that transactions between such federal areas as Moffett Field and the rest of the state do not come within the power of Congress to regulate interstate commerce, because such areas do not fall within the categories of states, foreign nations, or Indian tribes set forth in the commerce clause. The judicial interpretation of the commerce clause, however, has greatly amplified the meaning of interstate commerce. Thus, commerce between states and territories has long been recognized as interstate commerce. (*Hanley* v. *Kansas City So. Ry. Co.,* 187 U. S. 617 [23 S. Ct. 214, 47 L. Ed. 333]; *Inter-Island Steam Navigation Co.* v. *Hawaii,* 96 Fed. (2d) 412, aff'd 305 U. S. 306 [59 S. Ct. 202, 83 L. Ed. 189].) Commerce between States and the District of Columbia is similarly recognized as interstate commerce. (*Stoutenburgh* v. *Hennick,* 129 U. S. 141 [9 S. Ct. 256, 32 L. Ed. 637]; *Galloway* v. *Bell,* 11 Fed. (2d) 558.) Such areas as Moffett Field are in the same category as the District of Columbia, for the same power of Congress extends over them both. (U. S. Const., Art. I, sec. 8, cl. 17; *Surplus Trading Co.* v. *Cook,* 281 U. S. 647 [50 S. Ct. 455, 74 L. Ed. 1091]; *Fort Leavenworth R. R. Co.* v. *Lowe,* 114 U. S. 525 [5 S. Ct. 995, 29 L. Ed. 264].) In the light of the foregoing cases it is clear that the power of Congress to regulate interstate commerce, reinforced by its authority over territories and ''forts, magazines, arsenals, dockyards and other needed buildings'' enables it to regulate commerce between states and such areas as Moffett Field. (Compare *People* v. *Standard Oil Co.,* 218 Cal. 123 [22 Pac. (2d) 2]; *Grayburg Oil Co.* v. *State* [Tex. Civ. App.], 286 S. W. 489; *Grayburg Oil Co.* v. *State* [Tex. Com. App.], 3 S. W. (2d) 427, and *McKesson & Robbins* v.

*Collins,* 18 Cal. App. (2d) 648 [64 Pac. (2d) 469], which did not involve any federal statute regulating such commerce.)

The milk industry in California is dominantly a local one. Only a small percentage of the milk produced goes beyond the jurisdiction of the state, but whatever the destination of the milk, the state is vitally concerned with the stabilization of the industry, and particularly with standards of production, in the state as a whole. The federal territory within the state is so fragmented that there may be several federal islands within a single marketing area. If they are citadels of immunity from state jurisdiction, they are also exceptional segments in areas that are otherwise subject to that jurisdiction. They stand out like colored pins on the map of California, and range from military reservations to soldiers' homes, from court houses to penitentiaries, from post offices to Indian reservations, from national parks to regional dams. (See cases cited in 38 Columb. L. Rev. 128, at 130.) The commerce between them and the rest of the state is of the greatest interest to the state regardless of the circumstance that it may be regulated by the federal government. Focussed as it is upon a state problem, the state act, despite its repercussions upon interstate commerce, does not run counter to the commerce clause so long as it does not conflict with the provisions or objectives of Congressional legislation. (*Milk Control Board* v. *Eisenberg Farm Products,* 306 U. S. 346 [59 S. Ct. 528, 83 L. Ed. 752] ; *Duckworth* v. *Arkansas,* —— U. S. —— [62 S. Ct. 311, —— L. Ed. ——] ; *California* v. *Thompson,* 313 U. S. 109 [61 S. Ct. 930, 85 L. Ed. 1219] ; *South Carolina State Highway Dept.* v. *Barnwell Bros.,* 303 U. S. 177 [58 S. Ct. 510, 82 L. Ed. 734]. See 27 Cal. L. Rev. 615.)

The objectives of the federal act in fixing the minimum price payable by the distributor to the producer are the same as those of the California act, namely, to insure to the producer a reasonable return on his products (secs. 1 and 2), and to the consumer a "sufficient quantity of pure and wholesome milk." (Sec. 8 (c) (18).) There is no federal marketing agreement or order with respect to the milk industry, however, now in effect in this state. Where a conflict is apparent the state legislation must yield. (*United States* v. *Wrightwood Dairy Co.,* —— U. S. —— [62 S. Ct. 523, —— L. Ed. ——] ; *Cloverleaf Butter Co.* v. *Patter-*

*son,* —— U. S. —— [62 S. Ct. 491, —— L. Ed. ——].)
There is a question, however, whether any conflict exists when
a federal administrative officer is empowered to prescribe
regulations in a field already regulated by a state but does
not actually do so. The United States Supreme Court has
held in some cases that a conflict of authority is inherent in
such a situation by interpreting the failure of the federal
officer to make any regulation as in effect a ruling that neither
federal nor state regulation is necessary. (*Oregon-Washing-
ton R. & N. Co.* v. *Washington,* 270 U. S. 87 [46 S. Ct. 279,
70 L. Ed. 482] ; *Napier* v. *Atlantic Coast Line Ry. Co.,* 272
U. S. 605 [47 S. Ct. 207, 71 L. Ed. 432].) There is a grow-
ing tendency on the part of the court, however, to empha-
size the evils arising from the absence of any regulation, and
to hold therefore that the existence of an unexercised supe-
rior federal authority does not rule out state regulation vital
to the public welfare. This realistic view germinated in cases
upholding state regulation of certain public utility practices
that the Interstate Commerce Commission did not regulate
although it had authority to do so. (*Northwestern Bell Tele-
phone Co.* v. *Nebraska State Ry. Commission,* 297 U. S. 471
[56 S. Ct. 536, 80 L. Ed. 810] ; *Missouri Pacific Ry. Co.* v.
*Larabee Flour Mills Co.,* 211 U. S. 612 [29 S. Ct. 214, 53
L. Ed. 352].) The court has balanced, not the state regu-
lation against the unexercised federal authority, but the im-
portance of the state's objectives against the effects of its
regulation on interstate commerce. It has rejected the theory
that the failure of a federal administrative agency to exer-
cise its authority necessarily amounts to a declaration against
all regulation. Indeed, in *H. P. Welsh Co.* v. *New Hamp-
shire,* 306 U. S. 79 [59 S. Ct. 438, 83 L. Ed. 500], it dem-
onstrated its concern with keeping the state regulation alive
in the absence of immediate conflict with federal regulation.
It upheld in that case the application of a state act regu-
lating the hours of drivers of motor carriers to a driver trans-
porting an interstate shipment, even though the Interstate
Commerce Commission had overlapping authority and had
issued regulations that would conflict with the state act
when they became effective two years later. The court took
the view that the safety of the people should not wait upon
federal administrative action. (See, also, *Kelly* v. *Washing-
ton,* 302 U. S. 1 [58 S. Ct. 87, 82 L. Ed. 3] ; *South Caro-*

*lina State Highway Dept.* v. *Barnwell Bros.; supra; Eich-. holz* v. *Public Serv. Commission,* 306 U. S. 268 [59 S. Ct. 532, 83 L. Ed. 641]; *Maurer* v. *Hamilton,* 309 U. S. 598 [60 S. Ct. 726, 84 L. Ed. 969]; *Mintz* v. *Baldwin,* 289 U. S. 346 [53 S. Ct. 611, 77 L. Ed. 1245].)

Public health, like public safety, is a vital concern of the state, and its maintenance at proper levels should likewise not wait upon federal regulation. Toward that maintenance the California milk control act contributes largely, but it might well be disrupted if those engaged in interstate commerce escaped the state regulation while they were untouched by corresponding federal regulation. The absence of federal regulation may well be a recognition not only of the propriety but of the effectiveness of state regulation in the stabilization of a dominantly local industry, rather than a ruling that there should be no regulation.

■ There remains the question whether the milk control act can validly affect milk sold to instrumentalities of the United States. In a brief filed as *amicus curiae* on behalf of the United States, the United States Attorney contends that the application of the state act to such milk would unduly burden the operation of an essential federal agency, and that it is inconsistent with the federal statutes requiring that army supplies be secured through competitive bidding. (41 U. S. C., sec. 5; 10 U. S. C., secs. 1200-1201.) Federal agencies, however, cannot entirely escape the effects of state legislation. The California milk control act does not discriminate against the United States army nor substantially hinder its efficient operation. The army is not precluded from obtaining milk, nor required to pay more for such milk than other consumers in the same area. The act regulates not the army but the distributors who are independent contractors with the federal government. It is settled that such contractors are subject to state control, and that any consequent burden on the Federal Government is speculative and remote. (*Milk Control Board* v. *Gosselin's Dairy, Inc.,* 301 Mass. 174 [16 N. E. (2d) 641]; *Paterson Milk & Cream Co., Inc.* v. *Milk Control Board,* 118 N. J. L. 383 [192 Atl. 838]; *Alabama* v. *King & Boozer,* —— U. S. —— [62 S. Ct. 43, —— L. Ed. ——]; *James* v. *Dravo Contracting Co.,* 302 U. S. 134 [58 S. Ct. 208, 82 L. Ed. 155, 114 A. L. R. 318]; *Atkinson* v. *State Tax Com. of Oregon,* 303 U. S. 20 [58 S. Ct. 419, 82 L. Ed. 621]; *State Tax Com.* v. *Van Cott,*

306 U. S. 511 [59 S. Ct. 605, 83 L. Ed. 950]; *Helvering* v. *Gerhardt*, 304 U. S. 405 [58 S. Ct. 969, 82 L. Ed. 1427]; *Trinity Farm Const. Co.* v. *Grosjean*, 291 U. S. 466 [54 S. Ct. 469, 78 L. Ed. 918]; see 27 Cal. L. Rev. 327.) The very federal statutes requiring competitive bidding except cases "where it is impracticable to secure competition" (10 U. S. C. sec. 1201), and Regulation 5-240 (g) of the United States Army provides that it is impracticable to secure such competition: "(3) When the price is fixed by Federal, State, municipal, or other competent authority." (*Penn Dairies, Inc.* v. *Milk Control Commission*, (March 25, 1941) Court of Common Pleas of Lancaster County, Pennsylvania; *Commonwealth* v. *Rohrer* (Pa.), 37 D. & C. 410.)

The alternative writ of mandamus is discharged and the petition for a peremptory writ is denied.

Gibson, C. J., Shenk, J., Curtis, J., Edmonds, J., Houser, J., and Carter, J., concurred.