## Penn Dairies, Inc., Appellant, *v.* Milk Control Commission of Pennsylvania.

Argued November 10, 1941.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, RHODES, HIRT, and KENWORTHEY, JJ.

*Harris C. Arnold,* with him *Owen P. Bricker,* of *Arnold & Bricker,* for appellant.

*Enoch E. Ellison,* with him *Francis M. Shea,* Assistant Attorney General, *Sidney J. Kaplan,* Special Assistant to Attorney General, *Gerald A. Gleeson* and *J. Barton Rettew, Jr.,* for intervenor.

*Frank E. Coho,* Deputy Attorney General, with him *Claude T. Reno,* Attorney General, for appellee.

OPINION BY KENWORTHEY, J., March 3, 1942:

The questions are: (1) Whether the Milk Control Law[1] authorizes the Milk Control Commission to fix minimum prices for the sale of milk to the United States; (2) whether there was, on February 15, 1941, any order of the Commission which, when properly construed, applied to such sales; and (3) if these questions are answered in the affirmative, whether the law, and the order issued pursuant to it, cast an unconstitutional burden upon the government.

The facts are virtually undisputed. On February 1, 1941, the government purchasing officer, at Indiantown Gap, sent to various milk dealers, including defendant,[2] invitations to bid on the milk requirements for the army reservation located there. The requirements called for the delivery of 135,000 one-quart bottles and 540,000 half-pint bottles between March 1 and June 30, 1941. On February 4, 1941, the Milk Control Commission promulgated a notice "To All Milk Dealers Interested In Submitting Bids to Furnish Milk to the United States Government at Indiantown Gap," one of which went to defendant. Accompanying the notice, were copies of the orders which the Commission deemed applicable. The notice indicated the minimum price to be $0.095 per bottle for the milk sold in quarts and $0.025 for that sold in half-pints, and the notice closed with a warning that any sales at prices below the pre-

---

[1] Act of April 28, 1937, P. L. 417, 31 PS 700j.

[2] Penn Dairies, Inc., for convenience, will be referred to as "defendant" in spite of the fact that Section 904 provides: "The appeal provided by this article from action of the Commission shall be by petition against the Commission, officially as defendant." This case was started by a citation against Penn Dairies, Inc., in which it was the defendant.

scribed minimums would be construed as violations of the law. The notice, except for the tabulation of specifications, is printed in the margin.[3] On February 15, 1941, the bids were opened and the contract awarded defendant as the lowest bidder. Defendant's bid for both quantities—$0.079 for the quarts and $0.0215 for the half-pints—was below the minimums.

On March 5, 1941, the Commission issued a citation to defendant to show cause why its application for a milk dealer's license for the year May 1, 1941 to and including April 30, 1942, should not be refused. The sole ground alleged was the aforesaid violation of its Order. Defendant, by answer, raised the questions which are now before this court. The Commission, having refused the license in an order which, on appeal, was sustained by the court of common pleas, defendant took this appeal.

*First.* Does the Milk Control Law authorize the Commission to fix minimum prices for milk sold to the government?

The Act, Section 802, provides: "The Commission shall fix ...... the minimum wholesale and retail

---

[3] "The quantities for the above items are listed as the estimated quantities required for each month during the period from March 1, 1941, to June 30, 1941, inclusive.

"For your information and guidance, we are enclosing herewith a copy of our Official General Order A-14, applicable to Area No. 11, the Statewide Milk Marketing Area, in which area Indiantown Gap, Pennsylvania, is located, and direct your attention to sub-paragraph (b), Section 4, of said Order, setting forth the minimum wholesale prices to be charged by or paid to milk dealers for Grade A milk, either raw or pasteurized; for Grade B milk, either raw or pasteurized, not exceeding 4.0% butterfat content; and for Plain Buttermilk, sold in bottles or other containers, in said Area No. 11.

"The Commission construes the Government Facility at Indiantown Gap, Pennsylvania, as a training camp or reservation, and as such, where milk is required in half-pint bottles or half-pint fibre containers, would be entitled to the special wholesale half-

prices ...... to be charged for milk sold within any milk marketing area of the Commonwealth wheresoever produced, *including* milk sold by: 1. Milk dealers to other milk dealers; 2. milk dealers to consumers; 3. milk dealers to stores ......; 4. stores to consumers ......" (Italics supplied.) Conceding, arguendo, that the government is not included in any of the enumerated classes, the question is whether "including" is a word of limitation—whether it means "including only". It is sometimes thus used; it is perhaps

---

pint school prices of said Order No. A-14.

"Where milk dealers propose to furnish Grade A milk, pasteurized Grade B milk, not exceeding 4.0% butterfat content, or Plain Buttermilk, meeting Federal Specifications, the following minimum unit prices should be considered in the preparation of their bids:

| Product | Unit Prices | |
| --- | --- | --- |
| | Quarts | Half-Pints |
| Grade A Milk, either raw or pasteurized ................. | $0.115 | $0.035* |
| Grade B Milk, either raw or pasteurized, not exceeding 4.0% Butterfat Content .................... | .095 | .0275* |
| Plain Buttermilk ......................... | .07 | .... |

"The Commission suggests that milk dealers acquaint themselves with Federal Specifications for milk, particularly C-M-381B.

"Any purchases or sales of milk made or offers to buy or sell milk at prices below the prescribed minimum prices of effective Official General Orders of this Commission are construed as violations of the Milk Control Law.

"The Milk Control Commission expects compliance with its orders, rules, and regulations, and will appreciate your cooperation in this matter.

* "Includes service charges for ice, straws, or special boxes. If these services are not rendered, these prices may be reduced by $0.0025 per half-pint.

> "COMMONWEALTH OF PENNSYLVANIA
> MILK CONTROL COMMISSION,
> EDWIN H. RIDGWAY,
>      Secretary."

more often used as a word of extension or enlargement.[*] "To arrive at the real meaning, it is always necessary to take a broad general view of the act, so as to get an exact conception of its aim, scope and object." *Keating v. White et al.,* 141 Pa. Superior Ct. 495, 504, 15 A. (2d) 396; Statutory Construction Act of May 28, 1937, P. L. 1019, 46 PS 551, 554, 563. The purpose of the law (Sec. 101) is to regulate and control the milk industry "for the protection of the public health and welfare and for the prevention of fraud." Section 801 provides: "The Commission shall base all prices upon all conditions affecting the milk industry in each milk marketing area, including the amount necessary to yield a reasonable return to the producer and to the milk dealer." As Mr. Justice STERN said in *Rieck-McJunkin Dairy Company v. Milk Control Commission,* 341 Pa. 153, 157, 18 A. (2d) 868: "The main purpose of the Milk Control Law [is] to insure a sufficient supply of wholesome milk, which cannot be accomplished unless, as the preamble of the act recites, 'the high cost of maintaining sanitary conditions of production and standards of purity is returned to the producers of milk,' ......" Although the prices to all classes of producers or dealers need not be the same, it is apparent that, in order to carry out the purpose of the law, the price fixing power must extend to *all* sales of milk by both producers and dealers. If these purposes are carried out, the legislation will inure to the benefit of the government as a part of a community within the Commonwealth, as well as to other consumers. On the other hand, if the policy of the law is not carried out as to the largest single buyer, the purpose may be frustrated. The Supreme Court has held that the provisions of the law

[*] *American Surety Co. v. Marotta,* 287 U. S. 513, 53 S. Ct. 260; *Cannon v. Nicholas,* 80 Fed. (2d) 934 (C. C. A. 10th); *Weller & Weller v. The Grange Mutual Casualty Insurance Co.,* 105 Pa. Superior Ct. 547, 161 A. 615; *McGlathery's Estate,* 311 Pa. 351, 166 A. 886.

apply to a governmental subdivision of this Commonwealth. *Zeuger Milk Co. v. Pittsburgh School District,* 334 Pa. 277, 5 A. (2d) 885. We hold that the Legislature intended the Commission to have the power to regulate the prices of sales to the United States, provided it is not unconstitutional.[5] And, in view of this conclusion, it is not necessary to consider whether the government is a "consumer" as defined in the act.

*Second.* Had the Commission, on February 15, 1941, issued any order fixing the minimum price of sales to the government for consumption at an army camp?

The Commission contends that the price was fixed by official General Order No. A-6, as amended by A-14.[6] The order provided wholesale prices for sales by "Milk dealers to other milk dealers and to stores for resale;

---

[5] The Statutory Construction Act of May 28, 1937, P. L. 1019, Article IV, Sec. 52, 46 PS 552, provides that in construing an act, the courts shall presume: "(3) That the Legislature does not intend to violate the Constitution of the United States or of this Commonwealth."

[6] "(B) Minimum Wholesale Prices. Milk dealers to other milk dealers and to stores for resale; and to bakeries, hotels, restaurants, hospitals and institutions for consumption on the premises:

| Product | Unit Price | | |
| --- | --- | --- | --- |
| | Quart | Pint | Half-Pint |
| Grade "A" Milk ..................... | $0.115 | $0.06 | $0.035 |
| Grade "B" Milk | | | |
| Exceeding 4.0% B. F. ............... | .105 | .06 | .035 |
| Not exceeding 4.0% B. F. ........... | .095 | .05 | .035 |
| Grade "B" Milk to Schools | | | |
| Not exceeding 4.0% B. F. ........... | .... | .... | .0275 |
| Cream Buttermilk, Chocolate Milk and other flavored Milk or Milk Drink containing more than 0.5% Butterfat | | | |

Same as Grade "B" Milk Exceeding 4.0% Butterfat

| | Quart | Pint | Half-Pint |
| --- | --- | --- | --- |
| Skim Milk ......................... | .06 | .... | .... |
| Buttermilk—Plain ................... | .07 | .05 | .03 |

(One Gallon, Single Container, Single Delivery, $0.25)"

and to bakeries, hotels, restaurants, hospitals and *institutions* ......" (Italics supplied) The price fixed for Grade B milk, not exceeding 4% butterfat, is $0.095 for quarts and $0.025 for half-pints. But there is a special provision for sales to schools, fixing $0.0275 for half-pints. It is to be noted that, for the sales of half-pints, the Commission allowed the lowest price on the schedule. Defendant admits the Indiantown Gap Military Reservation is an institution.[7] Defendant argues that, because of the unprecedented size of the contract—it was conceded to have been the largest single order for milk ever given in this Commonwealth—the cost to it of servicing the contract would be considerably reduced, that it could make a reasonable profit and maintain the price to the producers with a lower return, and that it is, therefore, unreasonable to suppose that the Commission intended the prices in Order A-14 to apply. The principal difficulty with this contention, as we see it, is that the evidence offered does not support it. Defendant offered, by stipulation,[8] figures to show "its average bottle breakage and losses where milk is served under ordinary conditions" as compared to losses from similar causes under the contract, there being an alleged difference of 2%. In the same manner, it offered evidence to show that "under ordinary circumstances de-

---

[7] The citation averred: "6. Indiantown Gap, a United States Military Reservation, is an institution of the United States for military training," and this averment was admitted in the corresponding paragraph of the answer.

[8] The stipulation was in two parts. It provided that paragraphs 1, 2 and 3, which have no application to the present question, "shall be treated as admitted facts." It then provided: "It is further agreed that the statements in the following paragraphs shall be received in evidence as competent testimony ......" Although the statements in these subsequent paragraphs were not contradicted, they were obviously intended to have less weight than those in the first three and we consider that they were open to analysis and that we are not bound by the inferences defendant would draw from them.

livery of the same quantity of milk would require a large number of trucks and drivers" and that, under the contract, there was a saving of delivery cost on each bottle of $0.0005. But there is nothing to indicate what the "ordinary circumstances" or the "ordinary conditions" were. Obviously, the difference in the cost of servicing a thousand customers is materially larger than the cost of servicing one. But the cost of servicing five or ten customers may not be. The schedule of prices fixed by the Commission for this contract, being the lowest possible, the cost must be compared, if the comparison is to be used as valid argument, with the cost of servicing other *large* customers, such as hotels, restaurants, hospitals and other large institutions. If the figure offered by defendant for comparison was weighted by the cost of servicing small, individual customers, the figure is of no value whatever. And there is no indication of what, exactly, the comparison means. We hold General Order A-1, as amended by A-14, covered the sale to the government.

*Third.* Does the Order impose an unconstitutional burden upon the government?

The extent to which, under our dual system of government, the states may burden the operations of the federal government has long been the subject of controversy. The Constitution does not expressly deal with it. From *McCulloch v. Maryland*,[9] decided in 1824, down to *James v. Dravo Contracting Co.*,[10] decided in 1937, Chief Justice MARSHALL's dictum that the power to tax is the power to destroy was the prevailing doctrine. Under it, any law which imposed a demonstrable burden on the government was held to be unconstitutional.[11] But, as Mr. Justice HOLMES pointed out in his

---

[9] 4 Wheat. 316.

[10] 302 U. S. 134.

[11] See statement of Mr. Justice ROBERTS (dissenting) in *James v. Dravo Construction Co.*, supra, at p. 161.

dissent in the Panhandle Oil Case,[12] "In those days it was not recognized, as it is today, that most of the distinctions of the law are distinctions of degree," and, "The power to tax is not the power to destroy while this court sits."[13] And the decision in *Graves v. O'Keefe*[14] and *Alabama v. King & Boozer*[15] have swept the doctrine into oblivion. In its place, a new test has arisen. "Since two governments have authority within the same territory, neither, through its power to tax, can be allowed to cripple the operations of the other. Therefore, state and federal governments must avoid exactions which *discriminate* against each other or *obviously interfere* with one another's operations.[16] (Italics supplied) Or, as Mr. Justice ROBERTS put it in his dissent in *James v. Dravo,* supra, a tax is valid if it bears upon an independent contractor, does not discriminate, and is not so burdensome as seriously to *interfere* with governmental functions.[17]

The Milk Control Law is not directed against the Indiantown Gap Reservation. If the objects of the law are realized, the Reservation will benefit in common with the community in general. Conversely, as already pointed out, if dealers are to be free to ignore the law in dealing with the Reservation, the whole plan will suffer proportionately. The Reservation can buy milk as others buy milk and at any price which competition may

[12] *Panhandle Oil Company v. Miss. ex rel. Knox,* 277 U. S. 218, 223.

[13] In his concurring opinion in *Graves v. New York ex rel. O'Keefe,* 306 U. S. 466, Mr. Justice FRANKFURTER characterized the dictum as a "seductive cliché."

[14] 306 U. S. 466.

[15] 314 U. S. 1, 62 S. Ct. 43. In this case a contractor erected an army camp under a cost-plus contract and the court upheld a tax on the sale of materials which was, therefore, ultimately paid by the United States. In a companion case, a "use" tax was also upheld. *Curry v. United States,* 314 U. S. 14, 62 S. Ct. 48.

[16] Mr. Justice FRANKFURTER in *Graves v. New York ex rel. O'Keefe,* supra, at page 488.

fix, not lower than the established minimum. There is no burden upon it which does not likewise fall upon all users of milk, including institutions of this Commonwealth. See *Zeuger Milk Co. v. Pittsburgh School District,* supra. No attempt is made in the law or in the Order of the Board to give any order or direction to the Reservation or its officers. The incidence of the law is upon dealers of milk. Although enforcement of the law against such dealers affects the price of milk to the Reservation as to others, yet that result is in its nature incidental. See *Milk Control Board v. Gosselin's Dairy Co.,* 301 Mass. 174, 16 N. E. (2d) 641, 643. Other statutes regulating the quality and providing for the inspection of milk are of similar effect. All safety and health laws, of which the Wage Law[18] is an example, increase prices. And since the King & Boozer Case, supra, such laws are not deemed invalid, even though the increased cost is directly passed on to the government.

That the test of constitutionality in cases involving police regulations is the same as in tax cases seems clear and is apparently conceded on all sides. *Baltimore & Annapolis R. R. v. Lichtenberg,* 176 Md. 383, 4 A. (2d) 734, appeal dismissed, 308 U. S. 525, 60 S. Ct. 297; also *Stewart & Co. v. Sadrakula,* 309 U. S. 94. A tax on materials, to be added to cost and passed on to the government, imposes a burden no less direct than that imposed by a statute which fixes the minimum price to be charged by an independent contractor selling milk to the government. The government is, by the

---

[17] He also points out (p. 172) in this dissenting opinion that the Solicitor General (now Mr. Justice REED) filed a Brief advocating that "A non-discriminating state tax is to be judged not by the 'burden' it imposes, but by the extent of its 'interference' with the functioning of government." Although Mr. Justice ROBERTS did not subscribe to the new test, it is interesting to note that he did not dissent in either *Graves v. New York ex rel. O'Keefe,* nor in the King & Boozer Case.

[18] Act of 1937, May 27, P. L. 917, 43 PS 331.

law, compelled to pay a demonstrably higher price in both instances. And we hold that, since the prices fixed are in no way discriminatory and are not such a burden as to interfere with the functioning of the federal government, they are valid. As Mr. Justice HOLMES said, "...... when the government comes into a state to purchase, I do not perceive why it should be entitled to stand differently from any other purchaser."[19] In the absence of prohibitive federal legislation, we are unwilling to disturb an enactment so well designed to provide for a local need.

Nor do we think the law interferes with the government's policy of competitive bidding. *Spahn v. Stewart,* 268 Ky. 97, 103 S. W. (2d) 651. The applicable statutes (U. S. Revised Statutes, Sec. 3709, 41 U. S. C. A. Sec. 5; 10 U. S. C. A. Secs. 1200 and 1201) provide merely that contracts for the purchase of supplies for the government shall be made after public notice and shall be awarded to the "lowest responsible bidder for the best and most suitable article." As pointed out in *United States v. Brookridge Farm, Inc.,* 111 F. (2d) 461, 463 (C. C. A. 10th), "The purpose of these statutes and regulations is to give all persons equal right to compete for Government contracts; to prevent unjust favoritism, or collusion or fraud in the letting of contracts for the purchase of supplies; and thus to secure for the Government the benefits which arise from competition." The Milk Control Law contravenes neither the language of the statutes nor any of the above stated purposes. It does no more than put all bidders on an equal footing with regard to the minimum price and as we have already pointed out, its primary purpose is to assure *responsibility* with all that the word implies.

In No. 311 October Term, 1941, the order of the court below affirming the order of the Milk Control

---

[19] Panhandle Oil Case, at page 224.

Commission is affirmed, the costs to be paid by appellant. In No. 3 October Term, 1942, the appeal of the United States, which intervened in the court below in the case represented by the appeal to No. 311 October Term, 1941, is dismissed.

DISSENTING OPINION BY RHODES, J.

I would reverse the order of the court below. Penn Dairies, Inc., the appellant, at the invitation of the Quartermaster of the United States Army, submitted a bid for furnishing bottled milk to the army at Indiantown Gap, Pa., for the months of March, April, and May, 1941. As low bidder appellant was awarded the contract to supply by daily deliveries, during such period, 540,000 half-pint bottles, and 135,000 quart bottles of milk. The only ground for this action was the alleged violation of the commission's minimum price schedules in its general order No. A-14. There is a stipulation as to facts and evidence. Paragraphs 1, 2, and 3 of the stipulation relate to admitted facts, and paragraphs 4, 5, 6, 7, 8, and 9 state what shall be considered as evidence of respondent (appellant here). In my opinion, this distinction is not especially material in this proceeding. There was no contradictory evidence. It seems too manifest to admit of any argument that if the commission's minimum price order applies in this case there could have been, as a matter of fact, no real competitive bidding. That was required in this case by acts of Congress. 41 U. S. C. A. §5; 10 U. S. C. A. §§1191-1225. It does not appear to have been within any exception to the requirement. Paragraphs 8 and 9 of the stipulation read:

"8. The profit which respondent [appellant here] would realize from the sale of the quantities covered by said contract, if sold at prices fixed by said order, would be a profit materially in excess of any margin of profit necessary to maintain stability in the milk industry.

"9. The margin of profit which the respondent [ap-

pellant here] will realize under the said contract is adequate for respondent's purposes and to maintain stability in the industry."

A minimum price materially in excess of that necessary to afford stability to the milk industry and to give a reasonable margin of profit to the dealer would certainly eliminate competitive bidding. No one will believe that any responsible dealer who was capable of complying with the contract would bid, as a practical matter, above the fixed minimum. All responsible bids would be at the fixed minimum, and consequently the effect of the commission's minimum price order would be to prevent the free competition which the market would warrant for such a quantity of milk.

For the disposition of this appeal, I do not consider it necessary to decide the constitutional questions which have been raised, or determine the power of the commission as applied to the facts in this case. It is sufficient to refer to the conclusion, which I think is erroneous, in the majority opinion that the commission, on February 15, 1941, had issued an order which applied to this sale to the United States Government. I agree with appellant's argument that the commission's general order contains no schedule which can properly be applied to this contract; that such a contract was not contemplated when the general order was formulated; and that the effort of the commission to apply schedules intended for widely different situations is arbitrary, unreasonable, and unjustified. The stipulation entered into between the parties recited in considerable detail the saving to appellant in performing its contract with the United States Government made possible by the quantity of milk to be delivered.[1] The majority opinion attacks this stipulation on the ground that it is indefinite, and finds difficulty in interpreting the terms, "ordinary circumstances," and "ordinary conditions."

---

[1] See stipulated and admitted facts (28a, 29a).

I think the meaning is clear for the purposes of this controversy; and what was meant does not appear to be disputed by the commission. The terms were intended to designate the usual course of appellant's business with reference to all its other sales of milk. It was agreed in the stipulation that this was "the largest quantity of milk to be delivered by a single seller to a single purchaser, or for delivery in quantity lots, known to the respondent or to the commission." The suggestion in the majority opinion that under the circumstances a more useful comparison could have been made with "the cost of servicing other *large* consumers, such as hotels, restaurants, hospitals and other large institutions" is not convincing, and I think it is inapplicable. No milk contract of this magnitude has been known in Pennsylvania before. Appellant therefore drew a comparison with all of the remainder of its business, the subject matter of the commission's ordinary exercise of its authority, to demonstrate the conclusion which the commission in the stipulation conceded thus: "The profit which respondent would realize from the sale of the quantities covered by said contract, if sold at prices fixed by said order, would be a profit materially in excess of any margin of profit necessary to maintain stability in the milk industry." No producer would benefit from such excessive profits to the dealer. In my opinion, the commission's general order No. A-14 does not cover this contract,[2] and was not intended to apply to the situation involved in this case, and the proper construction of that order makes it inapplicable to the facts which have been stipulated.

The commission's argument that if its order did not apply to the present transaction because the transaction

---

[2] This sale and purchase of milk by the Government of the United States for consumption by the army is not within the commission's order No. A-14 establishing minimum wholesale prices "to bakeries, hotels, restaurants, hospitals, and institutions for consumption on the premises," and to schools.

was not described in the order then appellant should have applied to the commission as to applicable prices raises a matter which is not here involved. If there was no applicable schedule, there was no violation by appellant of the order as charged.

I would therefore reverse the order of the court below in sustaining the commission's refusal of the application for renewal of appellant's license.