**UNITED STATES of America,**
Plaintiff,

v.

**William E. WARNE, Director of Agriculture of the State of California, and Stanley Mosk, Attorney General, State of California, Defendants.**

Nos. 39030, 39073.

United States District Court,
N. D. California, S. D.

Nov. 29, 1960.

George Cochran Doub, Asst. U. S. Atty. Gen., Donald B. MacGuineas, Harland F. Leathers, Dennis C. Cronin, Attys., Dept.

of Justice, Washington, D. C., Laurence E. Dayton, U. S. Atty., Charles Elmer Collett, Asst. U. S. Atty., San Francisco, Cal., for plaintiff United States.

Stanley Mosk, Atty. Gen. of California, John Fourt, Deputy Atty. Gen. of California, for defendant Warne, etc.

McVay, Stone & Reid, Modesto, Cal., amicus curiae for Milk Producers Assn. Central Calif.

Gordon, Knapp, Gill & Hibbert, Los Angeles, Cal., for Challenge Cream & Butter Assn.

Emil Steck, Jr., Pasadena, Cal., for Dairy Industry of California.

Before JERTBERG, Circuit Judge, and HARRIS and SWEIGERT, District Judges.

SWEIGERT, District Judge.

## I.

### Background of the Case.

The above two actions have been brought by the United States to determine the applicability of the California Milk Stabilization Law (Cal.Agricultural Code, Div. 6, Ch. 17, Secs. 4200 to 4420) to purchases made by the United States, through U. S. Army and Air Force procurement officers, of milk and milk products from local producers and distributors for on-base mess hall consumption and on-base commissary sales at three federal military installations located within the territorial limits of California.

Civil Action No. 39030, involving the Oakland Army Terminal, is before this Court on plaintiff's motion for a preliminary injunction. Civil Action No. 39073, involving Travis Air Force Base (Count I) and Castle Air Force Base (Count II), is before the Court on plaintiff's motion for summary judgment. Because these actions test the constitutionality of the State milk law as applied to the federal government, the present three judge court was assembled, pursuant to 28 U.S.C. §§ 2282 and 2284.

Two additional actions, Civil Action No. 39052, involving Camp Pendleton, and Civil Action No. 39059, involving Mather Air Force Base, are on file awaiting determination of these actions.

## II.

### California Milk Stabilization Act.

Briefly, the California Milk Stabilization Act was passed in 1935 to regulate the marketing and distribution of fluid milk and fluid cream. Cal.Agricultural Code Section 4201 declares that such products are necessary articles of food, that the production and maintenance of an adequate supply of healthful milk is vital to the public health and welfare, and that the policy of the State is to promote, foster and encourage the intelligent production and orderly marketing of milk, and to eliminate unfair and destructive trade practices.

To achieve these ends, marketing areas throughout the State were established (Section 4204), to be administered by the Director of Agriculture (Section 4270), whose duty it is to establish minimum milk prices (Sections 4246, 4247, 4281, 4352, 4353), and to license milk distributors within each marketing area (Sections 4244, 4375).

Under provisions of the Act, the Director is also empowered to revoke and suspend licenses for violation of any stabilization and marketing plan (Section 4415) to bring actions to enjoin such violations (Section 4256), and to prosecute actions to recover civil penalties of $500 for each violation (Section 4410).

The California Attorney General is also empowered to enforce the Act, under Article V, Section 21 of the California Constitution, Section 12511 of the California Government Code, and Section 4410, supra, to bring prosecutions for criminal violations of the milk code.

## III.

### Preliminary Matters.

The defendants, the California Director of Agriculture and the California Attorney General, have filed actions in various State courts, seeking injunctive relief and civil penalties against milk suppliers and distributors who have entered into

procurement contract with federal officials at the several military bases, calling for the sale of milk at negotiated prices less than those established under the State Act. (Exhibits 8–11). Defendants have also instituted declaratory judgment actions in this Court against federal procurement officers at Travis Air Force Base, Civil Action No. 39080, seeking a determination of their right to enforce the State law as to milk sales consummated at that base.

The United States contends that these State attempts to enforce the milk act have interfered with the purchase of milk and milk products by the United States at its military installations, over which it claims exclusive legislative jurisdiction, and are in conflict with federal competitive bidding policy and procedures, expressed in Armed Services Procurement Regulations, para. 1–301, 1–302.2, 3–101 and 3–108.1, and Army Procurement Procedure, para. 3–101.

The United States alleges that, being unable to obtain milk and milk products at less than the State minimum price, it has incurred additional operating costs of $15,000 per month on milk purchases at Travis Air Force Base (Rainey's Affidavit of March 8, 1960), $112,457 per year at Castle Air Force Base (Mann's Affidavit, Attachment H), and $10,000 per month at Oakland Army Terminal. (Complaint, para. 18).

■ It is the position of the United States that the State milk code may not constitutionally be applied to lands over which the United States has exclusive legislative jurisdiction; further that its enforcement violates the right of the plaintiff to be free from State interference in the exercise of a federal function, under the Supremacy Clause, Art. VI, Clause 2 of the United States Constitution. On these facts, we believe that a justiciable controversy exists. Florida Lime & Avocado Growers, Inc. v. Jacobsen, 1960, 362 U.S. 73, 80 S.Ct. 568, 4 L.Ed.2d 568; Public Utilities Commission of California v. United States, 1958, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470.

Preliminarily, the defendants urge that this Court should abstain from consideration of these cases on the merits, because of the existence of State questions which, if determined by the California State Courts, would render assistance to this Court in the formulation of its decision.

■ Although a determination of these cases upon the merits depends in part upon the legal effect of certain proceedings taken pursuant to State consent-to-purchase statutes and State cession statutes, the question whether the United States acquired exclusive legislative jurisdiction over the lands comprising the various military reservations under discussion is a federal question arising under Title 28 U.S.C. §§ 1331, 1345. Silas Mason Co. v. Tax Commission, 1937, 302 U.S. 186, 197, 58 S.Ct. 233, 82 L.Ed. 187.

In Allegheny County v. Frank Mashuda Co., 1959, 360 U.S. 185, 79 S.Ct. 1060, 3 L.Ed.2d 1163, it was held that a federal district court may not abstain from exercising its jurisdiction where there is no hazard of unnecessarily deciding a federal constitutional question, or of unsettling some delicate balance in the area of federal-state relationships, or of resolving difficult and uncertain issues of State law.

Such factors being absent, we are of the opinion that we should proceed to a consideration of the issues.

IV.

The Issues.

In Penn Dairies v. Milk Control Commission, 1943, 318 U.S. 261, 63 S.Ct. 617, 87 L.Ed. 748, the Supreme Court held that the Pennsylvania Milk Control Commission should not be restrained from enforcing a similar milk act or from refusing to license a milk distributor who had sold milk to the United States at a military installation at prices less than the minimum fixed by the Pennsylvania act. In that case, however, the Court noted that the military installation was situated, not on land over which the United States had exclusive jurisdiction,

but on land over which the State of Pennsylvania retained its jurisdiction.

In Pacific Coast Dairy, Inc. v. Department of Agriculture, 1943, 318 U.S. 285, 63 S.Ct. 628, 87 L.Ed. 761, decided the same day, the Court reached a different conclusion, holding that the California Department of Agriculture could not enforce the California milk code by revoking the license of a milk distributor for selling milk to the United States at a military reservation, Moffet Field, over which the United States exercised exclusive jurisdiction, at prices less than the minimum set by State law.

Recognizing that the results reached in the two cases might seem contradictory, the court noted, 318 U.S. at page 295, 63 S.Ct. at page 631, that: "in preserving the balance between national and state power, seemingly inconsequential differences often require diverse results."

In the instant cases, defendants seek to avoid application of the Pacific Coast Dairy case to the three military installations here involved upon the ground that these installations are not in fact within the exclusive jurisdiction of the United States and that, therefore, these cases are to be determined, not under Pacific Coast Dairy, but under the rule of Penn Dairies.

Defendants contend further, that even if these installations are within the exclusive jurisdiction of the United States, the penal provisions of the California Milk Act were assimilated as law within these federal enclaves under the so-called Assimilative Crimes Act, as amended in 1948, Title 18 U.S.C. § 13.

Plaintiff contends: First, that the three installations here involved are in fact within the exclusive jurisdiction of the United States.

Secondly, that even if they are not, these cases should not be determined under the rule of the Penn Dairies case, supra, because the California Milk Act is in conflict with federal procurement regulations and policy within the rule of Public Utilities Commission of California v. United States, 1958, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed.2d 470, to which we shall refer in due course; and, therefore, that so far as the United States is concerned, the California Act violates the Supremacy Clause of the United States Constitution, Art. VI, Clause 2.

Further, and for this reason, plaintiff contends that the penal provisions of the California Act could not have been assimilated in these enclaves under the Assimilative Crimes Act.

## V.

The Issue of Exclusive Jurisdiction.

### A. *Oakland Army Terminal*

The United States alleges, and the record shows without contradiction, that the lands comprising the Oakland Army Terminal were acquired by the United States in 1950 through condemnation proceedings for the purposes set forth in Art. I, Sec. 8, Cl. 17 of the Constitution. (Plaintiff's Memorandum, filed March 30, 1960; and Exhibit 1.)

That Constitutional provision reads in pertinent part as follows:

"The Congress shall have power * * * to exercise exclusive Legislation * * * over all Places purchased by the Consent of the Legislature of the State * * * for the Erection of Forts * * * and other needful Buildings."

At the time of the acquisition of Oakland Army Terminal in 1950, California Government Code Sec. 126 provided: "Notwithstanding any other provision of law, general or special, the Legislature of California consents to the acquisition by the United States of land within this State upon and subject to each and all of the following express conditions and reservations, in addition to any other conditions or reservations prescribed by law."

Then follow the various express conditions and reservations of the statute: "(a) The acquisition must be for the erection of forts * * * and other needful buildings, or other public purpose within the purview of Clause 17 of Section 8 of Article I of the Constitution of the United States * * *

"(b) The acquisition must be pursuant to and in compliance with the laws of the United States;

"(c) The United States must in writing have assented to acceptance of jurisdiction over the land upon and subject to each and all of the conditions and reservations in this section prescribed;

"(d) The conditions prescribed in subdivisions (a), (b), and (c) of this section must have been found and declared to have occurred and to exist, by the State Lands Commission, and the commission must have found and declared that such acquisition is in the interest of the State, certified copies of its orders or resolutions making such findings and declarations to be filed in the office of the Secretary of State and recorded in the office of the county recorder of each county in which any part of the land is situate;

"(e) In granting this consent, the Legislature and the State reserve jurisdiction on and over the land for the execution of civil process and criminal process in all cases, and the State's entire power of taxation * * * and reserve to all persons residing on such land all civil and political rights, including the right of suffrage, which they might have were this consent not given. * * * *"

The records of the California State Lands Commission, on file herein as attachments to Exhibit 1, show that by letter of acceptance from the Secretary of the Army to the California State Lands Commission, dated July 5, 1950, the Department of the Army accepted federal jurisdiction over the subject land in behalf of the United States.

Such acceptance of jurisdiction was made pursuant to the requirements of R.S. § 355, 40 U.S.C.A. § 255, which provides " * * * until the United States has accepted jurisdiction over lands * * it shall be conclusively presumed that no such jurisdiction has been accepted."

By resolution dated October 5, 1950, the State Lands Commission found "that the conditions prescribed in subdivisions (a), (b) and (c) of section 126 of the Government Code of the State of California had been found to have occurred and to exist and that such acquisition is in the interests of the State" (Resolution, Calif. State Lands Commission, October 5, 1950, Exhibit 1.)

Certified copies of the Order and Resolution of the State Lands Commission were filed in the office of the Secretary of State and recorded in the office of the County Recorder of Alameda County, where all the land is situated. By letter of October 31, 1950, the State Lands Commission notified the Secretary of the Army that full compliance had been made with Government Code Section 126. (Exhibit 1).

The State of California contends that California Government Code, Section 126, operates only as a consent to the acquisition of land by the United States, but not as a transfer of jurisdiction to the United States over the lands.

 We are of the opinion, however, that although Sec. 126 contains no express words to that effect, it manifests clearly the intent of the California legislature that it operates to transfer legislative jurisdiction over such lands.

The section makes express reference to land acquisitions for the purposes set forth in the U. S. Constitution, Art. I, Sec. 8, Cl. 17, a provision which deals specifically with the acquisition by the United States of "exclusive legislative jurisdiction", over lands purchased by the United States for such purposes with the consent of the legislature of the State.

Further, Section 126 expressly requires an assent in writing by the United States to "acceptance of jurisdiction over the land upon and subject to each and all of the conditions and reservations in this section prescribed."

Further, Sec. 126 makes express "reservations" of State jurisdiction over the land for specific, limited purposes—service of civil and criminal process and the power of taxation. These express reservations of certain limited areas of jurisdiction are consistent only with an intent

that jurisdiction would otherwise pass to the United States.

Further, as we shall mention in our discussion of Travis Air Force Base, the Attorney General of California has ruled that the precursor section of the above Government Code sec. 126 (Cal.Pol.Code Sec. 34), which is substantially similar to Government Code Sec. 126, is operative, not only as a mere consent to purchases, but to vest jurisdiction in the United States.

The State of California next contends that, assuming Section 126 is held to operate to transfer legislative jurisdiction, the section's reference to "other conditions or reservations prescribed by law" is in effect a reference to Government Code Section 113, as amended by Stats.1947, ch. 1532, p. 3164, repealed by Stats.1955, ch. 1447, p. 2636, which at the time of the acquisition of the lands comprising Oakland Army Terminal provided:

"The State reserves the administration of the criminal law of the State with respect to any land over which any jurisdiction has been or may be ceded or conveyed to the United States, during the time the United States is the owner thereof."

This provision, the State of California argues, reserved the penal provisions of the California Milk Stabilization Law, e. g., Sections 4361, 4410, from any transfer of jurisdiction.

■ We are of the opinion, however, that Section 113 is applicable only to lands "ceded" to the United States, as distinguished from lands acquired through purchase or condemnation by the United States with the State's consent— as in the case of these Oakland Army Terminal lands.

The distinction between these two methods of acquisition of jurisdiction by the United States over lands becomes clear in the light of the history of the judicial interpretation of Art. I, Sec. 8, Cl. 17 of the Constitution.

At an early date it was suggested that the only means by which the federal government could acquire jurisdiction from the States over lands was the so-called purchase-by-consent method provided by Art. I, Sec. 8, Cl. 17. See, United States v. Railroad Bridge Company, C.C.N.D.Ill. 1855, 27 Fed.Cas. pages 686, 693, No. 16, 114.

However, in Fort Leavenworth v. Lowe, 1885, 114 U.S. 525, 5 S.Ct. 995, 29 L.Ed. 264, the Supreme Court sustained the validity of Kansas legislation "ceding" to the United States legislative jurisdiction over Fort Leavenworth, situated on lands which the United States had no cause to "purchase", within the meaning of Art. I, Sec. 8, Cl. 17 of the Constitution, because the lands had been possessed by the United States before the admission of Kansas into the Union.

The Court thus recognized a new method, i. e., "cession", by which the United States might acquire jurisdiction over lands where no "purchase" for constitutionally specified purposes was involved, e. g., when the lands had been part of the public domain and had been reserved from sale, Fort Leavenworth v. Lowe, supra, or when, although a purchase was involved, the purpose was not one enumerated by Art. I, Sec. 8, Cl. 17 of the Constitution, Collins v. Yosemite Park Co., 1938, 304 U.S. 518, 58 S.Ct. 1009, 82 L.Ed. 1502.

Following the Fort Leavenworth decision, a number of States adopted so-called "cession statutes" to supplement their consent-to-purchase statutes. One of these States was California, which in 1891 adopted its cession statutes, Stats. 1891, ch. 181, p. 262, codified into Government Code Section 113, effective August 4, 1943, referred to above; also, Stats.1897, ch. 56, p. 51, codified into Government Code Section 114, effective August 4, 1943, until repealed by Stats. 1947, ch. 1532, p. 3164, to which we will later refer in our discussion of Travis and Castle Air Force Bases.

The California Attorney General has himself recognized that acquisition by the federal government of exclusive jurisdiction over land by the consent-to-purchase method, provided in Art. I, Sec.

8, Cl. 17, is distinct from the acquisition of exclusive jurisdiction pursuant to these State "cession" statutes, (See, Report of the California Attorney General, Jurisdiction Over Federal Enclaves in California, 1958, pp. 3, 42, 72–73; also, 23 Op.Cal. Attorney General 14 (1954)).

■ We are of the opinion, therefore, that Government Code Sec. 113 did not reserve administration of the criminal provisions of the California Milk Stabilization Act over the lands comprising Oakland Army Terminal.

Defendants next contend that, even though exclusive jurisdiction was effectually tendered to the United States, only "partial" jurisdiction was in fact accepted by the United States in the letter of acceptance sent by the Secretary of the Army to the California State Lands Commission, dated July 5, 1950, referred to above, wherein it was stated: "The Department of the Army, in behalf of the United States of America, hereby assents to the acceptance of federal jurisdiction over the subject land."

Defendants make the point that the use of the phrase "federal jurisdiction" by the Secretary of the Army and his omission of the phrase "exclusive jurisdiction," a phrase which appeared in previous letters of this kind from the Secretary of War, signifies an intent to accept only "partial" jurisdiction.

■ We do not agree with this contention. The letter of acceptance from the Secretary of the Army, forwarded pursuant to R.S. § 355, 40 U.S.C.A. § 255, referred to above, accepts federal jurisdiction without qualification. This letter effectively accepted the exclusive jurisdiction contemplated by Art. I, Sec. 8, Cl. 17 of the Constitution.

**B.** *Travis Air Force Base*

The United States alleges and the record shows without contradiction that the lands on which Travis Air Force Base is located were acquired by the United States between December, 1942 and March, 1943, through various purchases and condemnations, for military purposes

under the provisions of Art. I, Sec. 8, Cl. 17 of the Constitution. (Attachments A and B to LaBuda's Affidavit; and deeds and condemnation awards attached to Exhibits 1, 2 and 3).

California Political Code Section 34, codified into Government Code Section 111, Stats.1943, ch. 134, p. 1009, repealed by Stats.1947, ch. 1532, p. 3163, at the time of these acquisitions provided: "The legislature consents to the purchase or condemnation by the United States of any tract of land within this state for the purpose of erecting forts * * * and other needful buildings * * *" upon the express condition that all civil and criminal process may be served thereon.

On April 16, 1943, the Secretary of War communicated with the Governor of California, pursuant to R.S. § 355, 40 U.S.C.A. § 255, accepting "exclusive jurisdiction over all lands acquired by [the United States] for military purposes within the State of California, title to which has heretofore vested in the United States and over which exclusive jurisdiction has not heretofore been obtained." (Exhibit 4).

The State of California contends that California Political Code Section 34 operates only as a consent to the acquisition of land by the United States, but not as a transfer of jurisdiction to the United States over lands so acquired.

■ The California Attorney General has, himself, held that, under Art. I, Sec. 8, Cl. 17 of the United States Constitution, and under California Political Code Section 34, "jurisdiction" vests in the federal government upon compliance by the latter with its own statutes. See, also, Report of the California Attorney General, Jurisdiction over Federal Enclaves in California, 3, 72–3 (1958). We concur in this view.

The State of California next contends that the United States did not effectively accept any tendered transfer of jurisdiction by the State, because it failed to comply with Cal.Stats.1897, ch. 56, p. 51, codified into Government Code Section

114, which at the time of the acquisition of Travis Air Force Base provided:

"The State of California hereby cedes to the United States of America exclusive jurisdiction over all lands within this State now held, occupied, or reserved by the Government of the United States for military purposes or defense, or which may hereafter be ceded or conveyed to said United States for such purposes; provided, that a sufficient description by metes and bounds and a map or plat of such lands be filed in the proper office of record in the county in which the same are situated * * *" The act further reserves the right to serve civil and criminal process.

Specifically, the State of California contends that no such map or description by metes and bounds was ever filed.

█ As we have already noted in our discussion of Oakland Army Air Base, Stats.1897, ch. 56, and its related Stats. 1891, ch. 181, p. 262, are "cession" statutes, and are inapplicable to transfers of jurisdiction to the United States pursuant to the consent-to-purchase method provided in Art. I, Sec. 8, Cl. 17 of the Constitution.

In the report of the California Attorney General previously cited, it is specifically stated (p. 72–3) that the map or plat filing requirements of Stats. 1897, ch. 56 (Government Code sec. 114) are not applicable to such transfers.

C. *Castle Air Force Base*

The complaint alleges and the record shows without contradiction that the portion of Castle Air Force Base on which sales and deliveries of milk and milk products take place is a so-called Tract A, some eighteen acres of land, more or less, which the United States claims to have acquired for military purposes, within the meaning of Art. I, Sec. 8, Cl. 17 of the Constitution, under a deed, dated April 6, 1943, from one Sheldon M. Phillips to the United States. (Mann's Affidavit, p. 5; Attachment A to Dame's Affidavit).

At the time of the acquisition, the California consent-to-purchase statute was Political Code Section 34, referred to in our discussion of Travis Air Force Base, supra.

On April 16, 1943, ten days after the date of the deed under which the United States claims to have acquired Tract A for military purposes, the Secretary of War communicated with the Governor of California, pursuant to R.S. § 355, 40 U.S.C.A. § 255, accepting "exclusive jurisdiction over all lands acquired by [the United States] for military purposes within the State of California, title to which has heretofore vested in the United States and over which exclusive jurisdiction has not heretofore been obtained." (Exhibit 4).

The contentions of the defendants as to Castle Air Force Base are for the most part similar to those raised in connection with Travis Air Force Base, which we have already discussed.

In one respect, however, Castle Air Force Base presents a special problem. The State of California contends that the United States did not acquire title to Tract A, Castle Air Force Base, for military purposes on April 6, 1943, nor even by April 16, 1943, the date of the Secretary of War's letter to the Governor of California, accepting exclusive jurisdiction of all land "title to which has heretofore vested in the United States." Therefore, argues the State, Tract A was not included within the terms of that letter, and the United States has not in fact accepted exclusive jurisdiction over Tract A.

The record shows that Tract A was originally acquired by the National Housing Agency for the construction of war housing (Attachments B and C to Dame's Affidavit), under the provisions of the Lanham Act, 54 Stat. 1125, 42 U.S.C.A. § 1521 et seq., Section 10 of which precludes the United States from accepting exclusive jurisdiction over land so acquired.

Thereafter by letter, dated October 21, 1942, effective September 1, 1942, Tract A was transferred from the National Housing Agency to the War Department.

(Attachment D to Dame's Affidavit). On April 6, 1943, pursuant to a lawful condemnation action, a deed from one Sheldon M. Phillips to the United States was delivered to the War Department, (Attachment A to Dame's Affidavit) and the certificate of title was declared satisfactory by the United States Attorney General by letter dated September 29, 1943, addressed to the Secretary of War. (Attachment E to Dame's Affidavit).

The State of California contends, however, that title to Tract A did not pass to the United States under this deed of April 6, 1943, for the reason that the grantor, Sheldon M. Phillips, did not himself receive title to Tract A until July 17, 1943, when he received a deed from the Federal Farm Mortgage Corporation. (Affidavit of Paul Andrew; Attachment A thereto). Therefore, argues the State, Phillips' prior deed of April 6, 1943 did not pass title to the United States until at least July 17, 1943, under the rule of after-acquired title, set forth in California Civil Code Section 1106.

Defendants contend that there is thus presented a material issue of fact relative to the time of the transfer of title to the United States, and that for this reason the Court cannot grant summary judgment in the case of Castle Air Force Base.

Assuming, without deciding, that the Phillips deed of April 6, 1943 did not effectively convey title in Tract A to the United States, and that, therefore, Tract A was not within the terms of the Secretary of War's letter of acceptance of exclusive jurisdiction, we note that there is contained in the record another and subsequent letter, dated January 3rd of the following year, 1944, which accepts exclusive jurisdiction in terms similar to the prior letter of April 16, 1943. (Part of Exhibit 12).

■ It is clear, even upon the State's theory, that the United States had acquired title to Tract A by July 17, 1943 (Andrew Affidavit, supra). In that case, the letter of the Secretary of War, dated January 3, 1944, accepting exclusive jurisdiction over all lands title to which had previously vested in the United States, was applicable by its terms to Tract A and effectively accepted jurisdiction over it, even if the previous acceptance letter of April 16, 1943 did not. (Exhibit 12, supra).

The State of California makes the further point that Section 10 of the Lanham Act, under which Tract A was originally acquired, provides that the United States shall not accept exclusive jurisdiction over lands so acquired.

■ We are of the opinion, however, that after the transfer of Tract A from the National Housing Administrator to the War Department, pursuant to 42 U.S.C.A. § 1524, for military purposes, statutory provisions of the Lanham Act, including Section 10, became inapplicable to the land. The War Department would not be subject to statutory provisions pertinent only to lands held by the National Housing Agency for Lanham Act purposes. Upon its acquisition of Tract A for its own military purposes the War Department held it subject only to statutes pertinent to its own powers and purposes.

In the possession of the War Department, Tract A came within the provisions of Article I, Section 8, Clause 17 of the Constitution and, with the consent of the State of California provided in Political Code Section 34, the United States, through the War Department, could accept exclusive jurisdiction over it.

There is, therefore, no material issue of fact involved in our conclusion that Castle Air Force Base is within the exclusive jurisdiction of the United States.

## VI.

The Issue of the Supremacy Clause.

We turn now to the contention of the plaintiff that, even if these installations are not within the exclusive jurisdiction of the United States, there is a conflict between the California Milk Stabilization Act and federal procurement regulations and policy, and that, therefore, the milk

act, so far as the United States is concerned, violates the Supremacy Clause of the Constitution, Art. VI, Cl. 2.

In considering whether the California Milk Act is inconsistent with federal procurement regulations and policy, we must bear in mind that the Supreme Court in the Penn Dairies decision, referred to at the outset of this opinion, held, *inter alia*, that the Pennsylvania Milk Control Law of April 28, 1937, P.L. 417, Purdon's Pa.Stat.Ann., Title 31 Section 700j–101 et seq., which is similar to the California act, was not in conflict with any federal procurement statute, regulation or policy.

The Court there took the view that federal legislation did not disclose a purpose to "immunize government contractors from local price-fixing regulations which would otherwise be applicable," (318 U.S. at page 278, 63 S.Ct. at page 625) even though such regulations imposed increased economic burdens on the federal government.

The Court particularly noted, however, that the Pennsylvania Milk Control Act was not directed at the federal government or its officers, citing the Pennsylvania State court below, 1942, 148 Pa. Super. 261, 270–271, 24 A.2d 717.

In a more recent expression of the Supreme Court upon the subject of conflict between State regulation and federal procurement policy, Public Utilities Commission of California v. United States, 1958, 355 U.S. 534, 78 S.Ct. 446, 2 L.Ed. 2d 470, which notes, but distinguishes the above Penn Dairies case, it has been held that California Public Utilities Code Section 530 is in clear conflict with federal procurement regulations sanctioning the policy of negotiated rates by federal procurement officers in shipments of federal property.

Section 530 provided in part that the California Public Utilities Commission "may permit common carriers to transport property at reduced rates for the United States, state, county or municipal governments, to such extent and subject to such conditions as it may consider just and reasonable. * * * "

In considering the question "whether the United States can be subjected to the discretionary authority of a state agency for the terms on which, by grace, it can make arrangements for services to be rendered it," (355 U.S. at page 539, 78 S.Ct. at page 450) the Court discussed federal procurement policy, stating at page 540 of 355 U.S., at page 451 of 78 S.Ct.: "Congress has provided a comprehensive policy governing procurement." Then, at page 542 of 355 U.S., at page 452 of 78 S.Ct.: "It seems clear that these regulations—which have the force of law, Leslie Miller, Inc. v. Arkansas, 352 U.S. 187 [77 S.Ct. 257, 1 L.Ed.2d 231]; Standard Oil Co. v. Johnson, 316 U.S. 481 [62 S.Ct. 1168, 86 L.Ed. 1611]—sanction the policy of negotiating rates for shipment of federal property and entrust the procurement officers with the discretion to determine when existing rates will be accepted and when negotiation for lower rates will be undertaken."

Federal procurement policy, dealing with federal contracts and purchases, whether in relation to the procurement of transportation or milk or other property or services, is set forth in the provisions of the Armed Services Procurement Act of 1947, 62 Stat. 22, 10 U.S.C. § 2301 et seq., described in the House of Representatives report as "a comprehensive revision and restatement of the laws governing the procurement of supplies and services." (House Rept. 109, 80th Cong., 1st Sess., p. 6).

That competitive bidding is the cornerstone of this policy is exemplified by 10 U.S.C. § 2304(a), which provides that purchases of property or services, or contracts therefor, shall be made by competitive bidding through formal advertising.

That section allows heads of agencies in certain special situations to negotiate purchases or contracts, rather than observe the basic competitive bidding policy, as, for example, purchases of perishable or non-perishable subsistence supplies, such as milk. Section 2304(a) (9).

Notwithstanding this last mentioned statutory exception, fluid milk is pur-

chased at Travis and Castle Air Force Bases by the Air Force through competitive, advertised contracts, pursuant to Air Force Procurement Instructions 2–102(c) (1).

Another exception, which should be noted, is Section 2304(a) (10), which authorizes negotiation where the purchase or contract is for property or services for which it is "impracticable to obtain competition." Defendants have sought to rely upon this exception, contending that it is "impracticable to obtain competition" where the State has established minimum milk prices. However, 32 C.F.R. Section 3.210–3 provides that this exception is inapplicable where negotiation is authorized for the purchase of perishable or non-perishable subsistence supplies, such as milk.

In any event, the procurement regulations are clear as to the paramount objective of defense procurement policy: "*Such procurement shall be made on a competitive basis whether by formal advertising or by negotiation, to the maximum practicable extent.*" 32 C.F.R. Section 1.301. (Emphasis supplied.)

We note further that milk and milk products are included within a general procurement scheme so comprehensive that it is designed, not only for economy and efficiency, but also for health and quality control. For example, 32 C.F.R. Section 608.1, specifically requires the award of contracts for procurement of milk or milk products to be limited to dairies which have passed defense inspections or which have been certified by federal authorities as approved sources of supply. See, also 32 C.F.R. Section 156.1, 156.2, regarding inspection generally, and 32 C.F.R. Section 608.3, regarding the inspection of milk plants and dairy farms.

It is evident, therefore, as stated in the Public Utilities case, that Congress has provided a comprehensive policy governing procurement. This is just as true in the case of milk purchases as it is in the case of transportation-rate contracts.

In the Public Utilities case the Court noted that California Public Utilities Code Section 2112 provided penalties applicable, not only to the carrier, but to shippers as well, and that the prohibition of the statute was so broad as to deny the United States the right to ship at reduced rates without State Commission approval.

The Supreme Court in the Public Utilities case, did not point to any provision of the Public Utilities Code, or any other California law or decision, which would expressly or impliedly indicate a legislative intent to aim the penal provisions of the Public Utilities Code directly at the federal government and its officers, if they should be shippers in violation of the code. The Court nevertheless, took the view that the Code was so directed, citing the District Court opinion (355 U.S. at page 538, 78 S.Ct. at page 450): " 'If a United States officer were to negotiate with a carrier for "reduced rates" without permitting the defendant to determine whether it "considered" the conditions of the contract "just and reasonable", he could be thrown into the county jail.' 141 F.Supp. [168] at page 186."

The Court distinguished the Penn Dairies decision for the stated reason that there, the Court (318 U.S. at page 270, 63 S.Ct. at page 621) had concluded that the State regulation "imposes no prohibition on the national government or its officers." In the Public Utilities case, the Court continued, " * * * the State places a prohibition on the Federal Government." 355 U.S. at page 544, 78 S.Ct. at page 453.

The United States contends that, even if the Penn Dairies decision has not been overruled in effect by the Public Utilities case, supra, the Penn Dairies decision is inapplicable here for the same reason on which it was distinguished in the Public Utilities case, i. e., that the California Milk Stabilization Act, unlike the Pennsylvania Milk Control Act, does impose a prohibition on the federal government and its officers.

In our consideration of the merit of this contention we note certain provisions of the California Milk Act which are

quite analogous to the provisions of the Public Utilities Code considered in the Public Utilities case.

Under Section 4361 of the California Milk Law, the duty to observe established minimum milk prices and penalties for failure to do so, are imposed, not only upon milk producers and distributors with respect to their sales of milk, but also upon all retail stores, restaurants, confectioneries, or *other places for consumption on or off the premises,* (emphasis supplied) which "purchase" milk from distributors, or which sell to any consumer.

Section 4361 contains further broad provisions designed to make such "purchases" of milk unlawful regardless of the method or device utilized, and regardless of whether they are effected directly or through agents, employees, or subsidiaries.

Section 4280(f) makes it unlawful to handle milk within the marketing areas of the State which is to be sold at less than established minimum prices "at any place * * * whether * * * part of the marketing area or not."

Section 4410 makes the violation of any provision of the act, or of any stabilization and marketing plan, or of any order of the director, or of any of the unfair practices thereof, a misdemeanor.

The language of these sections is broad enough to include the federal government and its procurement officers, as purchasers of milk from distributors at the various federal military reservations for consumption either on base in the military mess halls, or off base through retail sales made in military commissaries.

We are unable to discover any substantial difference between the situation considered in the Public Utilities case and the situation here presented.

The federal procurement statutes, regulations and policy there were substantially similar to those here involved.

The Public Utilities Code there considered, applied not only to carriers, but to shippers, including shipments by the United States. So, also here, the milk act applies not only to milk producers and distributors, but also to purchasers of milk, including purchases of milk by the United States. Indeed, the basic contention of the State of California in its brief, and the ruling of its Supreme Court in Pacific Coast Dairy, Inc. v. Department of Agriculture, 1942, 19 Cal.2d 818, 123 P.2d 442, has been and is, that its milk act applies to sales of milk in which the United States is the purchaser.

In the Public Utilities case the United States was "subjected to the discretionary authority of a state agency for the terms on which by grace, it can make arrangements for services to be rendered it." 355 U.S. at page 539, 78 S.Ct. at page 450. So, also, here the United States is subjected to the discretionary authority of the Director of the California Department of Agriculture (who establishes minimum milk prices for marketing areas) for the terms on which by grace, it can make arrangements for purchases of milk at its various military installations.

In the briefs in the pending cases, the State of California disclaims any intent to enforce the penal provisions of its milk act against the United States or its procurement officers. A similar disclaimer proved of no avail in the Public Utilities case. (See reference to record 355 U.S. at page 551, 78 S.Ct. at page 456).

We conclude, therefore, that even if the Penn Dairies case has not been in effect overruled by the Public Utilities case, it is inapplicable here because the California Milk Stabilization Act "places a prohibition on the Federal Government" within the meaning of the Public Utilities case, and, therefore, so conflicts with federal procurement statutes and policy as to be invalid under the Supremacy Clause, Art. VI, Sec. 2.

### VII.

#### The Issue of Assimilation.

Defendants contend that, even if the State be deemed to have transferred exclusive jurisdiction over the three bases here involved to the federal government, the existing criminal laws of California

remained operative therein or became operative thereto by virtue of the provisions of Title 18 U.S.C. § 13, the so-called Assimilative Crimes Act, as amended in 1948, which provides:

"Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment."

Title 18 U.S.C. § 7, referred to in the foregoing section, provides, subsection (3), that the term "special maritime or territorial jurisdiction of the United States" includes:

"Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States by consent of the legislature of the State in which the same shall be, for the erection of a fort, magazine, arsenal, dockyard, or other needful building."

It has been held that Title 18 U.S.C. § 13 is not an unconstitutional delegation of power to the State legislatures, even though it in effect makes applicable to a federal enclave subsequently enacted criminal laws of the State within which the enclave is located. United States v. Sharpnack, 1958, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282.

■ The statute constitutes an adoption by Congress for federal enclaves of State criminal law, when federal criminal law has not defined a certain offense or provided for its punishment. People of Puerto Rico v. Shell Co., 1937, 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235. The State law, assimilated under this section,

becomes in effect federal law. Johnson v. Yellow Cab Co., 1944, 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814.

In Pacific Coast Dairy, Inc. v. Department of Agriculture, 1943, 318 U.S. 285, at page 294, 63 S.Ct. 628, at page 630, 87 L.Ed. 761, the possibility of the assimilation of local law was noted by the Supreme Court, with this statement: "When the federal government acquired the tract [Moffet Field], local law not inconsistent with federal policy remained in force until altered by national legislation," citing James Stewart & Co. v. Sadrakula, 1940, 309 U.S. 94, 60 S.Ct. 431, 84 L.Ed. 596.

The Court further noted, however, that Moffet Field, there involved, had been acquired by the United States in 1931, long before the enactment of the milk stabilization law in 1935, and concluded that no assimilation had occurred in the case of Moffet Field.

Defendants point out that Travis and Castle Air Force Bases, acquired by the United States in 1943, and Oakland Army Terminal, acquired in 1950, were all acquired subsequent to the enactment of the California Milk Stabilization Act of 1935. They argue that by operation of the Assimilative Crimes Act, enacted in its present form in 1948, the penal provisions of the milk act, notably Sections 4361 and 4410, were adopted as federal law on these enclaves.

The Courts have held, however, that the Assimilative Crimes Act does not operate to adopt any State penal statutes which are in conflict with federal policy, as expressed by acts of Congress or by valid administrative regulations having the force of law. Air Terminal Services Inc. v. Rentzel, D.C.E.D.Va.1949, 81 F. Supp. 611; Nash v. Air Terminal Services Inc., D.C.E.D.Va.1949, 85 F.Supp. 545; Johnson v. Yellow Cab Co., supra.

■ If, therefore, we are correct in our ruling that the California milk act is in conflict with federal procurement regulations and policy within the meaning of the Public Utilities case, the penal

provisions of the act were not assimilated into the installations here involved.

Even if we assume that there is no conflict between the California milk act and federal procurement policy and further, that its penal provisions could have been assimilated in these installations notwithstanding exclusive federal jurisdiction over them, any such assimilated provisions would have become federal, not state law, and as such, their enforcement would be the prerogative of the United States Attorney General and the various United States Attorneys.

The State of California, conceding that such would be the case, takes the position that, although violations of assimilated provisions of the milk laws within federal enclaves would be subject to prosecution only by federal authorities in the federal courts, violations of the milk act would also be subject to prosecution by State authorities in State Courts when such violations involved conduct of distributors occurring on state territory and constituting a violation of state law. Commonwealth v. Rohrer, 1937, 37 Pa. Dist. & Co. 410.

In this respect, we note that Section 4280(f) of the milk act, already referred to, makes it unlawful to handle milk within the marketing areas of the State which is to be sold at less than established minimum prices at any place, whether part of the marketing area or not.

We understand the position of the defendants to be that, assuming assimilation of the penal provisions of the milk act in exclusive jurisdiction enclaves, such circumstance would be an equitable factor for this Court to consider before granting injunctive relief to the federal government, which in effect would preclude the State from enforcing its milk law against distributors selling to the federal government even though their conduct may occur on State territory and constitute unlawful conduct under State law.

Such a contention would, in any event, be pertinent to the pending cases only indirectly and collaterally. Absent a prosecution by the federal government under the provisions of the Assimilative Crimes Act, this Court would abstain from a ruling upon the question whether the milk act, if not in conflict with federal regulation and policy, would have been assimilated within these enclaves.

In Johnson v. Yellow Cab Co., 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814, Oklahoma State enforcement officials, enjoined on petition of a common carrier from attempting to enforce State liquor laws with respect to purchases of liquor at Fort Sill military reservation, contended that the State liquor law had been assimilated at the base. The Supreme Court refrained from ruling on this point, saying: (321 U.S. at pages 392–393, 64 S.Ct. at page 627)—

"If the carrier's delivery of these liquors on the Fort Sill Reservation would violate any federal law, federal agencies exist which are charged with responsibilities to institute appropriate proceedings against the carrier in federal tribunals. In such proceedings the parties would be the United States and the carrier, and the issue of violation of federal laws would be directly, and not collaterally, presented. The complicated federal questions involved, concerning various federal statutes as well as Army rules and regulations, could be answered upon an adequate presentation of all facts essential to a right and just determination."

### Conclusion.

For the reasons herein stated, the Court concludes, subject to the preparation by the plaintiff in these cases, as prevailing party, of findings of fact and conclusions of law, decree and writ, and settlement and signing thereof by the Court, pursuant to Rule 21 of this Court:

That, in Civil Action No. 39030, defendants' motion to stay proceedings, to quash the temporary restraining order and to deny the petition for preliminary injunction, be denied; that a decree be

entered declaring the aforesaid sections of the California Agricultural Code, insofar as they prohibit or authorize the prohibiting of distributors and producers of milk within the State of California from selling and delivering milk to the United States at the Oakland Army Terminal at rates lower than those established by defendants, as unconstitutional and void; and, that the defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, be permanently enjoined from making any effort to prohibit such producers and distributors or the United States and its purchasing agents from negotiating and making arrangements and contracts for the sale and delivery of fluid milk to the United States at the Oakland Army Terminal at rates lower than those established by defendants;

Further, that in Civil Action No. 39073, defendants' motion to stay proceedings, to quash the temporary restraining order and to deny the petition for preliminary injunction, be denied, and that plaintiff's motion for summary judgment be granted, and that a decree be entered declaring the aforesaid sections of the California Agricultural Code, insofar as they prohibit or authorize the prohibiting of distributors and producers of milk within the State of California from selling and delivering milk to the United States at Travis Air Force Base and Castle Air Force Base at rates lower than those established by defendants, as unconstitutional and void; and, that the defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, be permanently enjoined from making any effort to prohibit such producers, distributors, or the United States and its purchasing agents from negotiating and making arrangements and contracts for the sale and delivery of fluid milk to the United States at Travis Air Force Base and Castle Air Force Base at rates lower than those established by defendants.